IN MATTER OF VOLUNTARY ASSIGNMENT OF LINTON, and another, Assignors, Appellants, v. SCHMIDT, Trustee and Assignee, and others, Respondent.

Supreme Court

*No. 76–144. Argued February 28, 1979.—Decided March 27, 1979.*
(Also reported in 277 N.W.2d 136.)

184

For the appellants there were briefs by *David L. Walther, John Sundquist* and *Walther & Halling* of Milwaukee, and oral argument by *David L. Walther.*

For respondent, Jerome S. Schmidt, there was a brief by *Marvin H. Davis* and *Joanis, Davis, Ablan & Joanis* of La Crosse, and oral argument by *Marvin H. Davis.*

For respondent, First Northwestern Bank of Winona, there was a brief and oral argument by *Donald J. Harman* of La Crosse.

BEILFUSS, C.J. The appellants-assignors, John D. Linton and Rose Marie Linton executed and filed a voluntary assignment for the benefit of creditors of all

of their non-exempt real and personal property pursuant to ch. 128, Stats., in the Circuit Court for Monroe county on May 27, 1975. On May 29, 1975, Jerome S. Schmidt was appointed receiver by order of the court and given broad authority to liquidate the assets for the benefit of the creditors.

Originally 2,283 acres of land, all located in Monroe county, were assigned to Schmidt as assignee and trustee. Of this total 112 acres were sold to one Dutton for $33,000. This was largely through the efforts of the Lintons and a friend, Douglas McCoy. The proceeds of this sale were used to satisfy the foreclosure judgment held by the Federal Land Bank and to redeem approximately 784 acres of land. The 112 acres is not involved in this appeal.

The remaining 2,171 acres were sold in one bulk sale to Norwood S. Ashley in the amount of $340,000. The assignee petitioned the court for approval of the sale. The approval was opposed by the Lintons. After a protracted hearing, the sale was approved by the court, and the Lintons, as assignors, appeal.

The appellants contend that the sale price of $340,000 is inadequate as a matter of law, and if not inadequate as a matter of law the sale should be set aside because the irregularities surrounding the sale contributed to an inadequate sale price.

A review of the record leads us to the conclusion that the findings of fact by the trial court to the effect the sale price was not inadequate are supported by credible evidence and not against the great weight and clear preponderance of the evidence, and that the trial court did not abuse its discretion in approving the sale.

Additional pertinent facts are as follows: The 2,171 acres of land in question is located in the Town of Wells in Monroe county, approximately four and one-half miles

from the City of Sparta. The land is about 75 percent contiguous and includes 652 acres of cropland. Very little of the cropland was Class I rated; most was listed as Class IV, VI and VII upon a scale of VIII, according to a soil and capability map prepared in December, 1975 by James Sanders of the United States Department of Agriculture, Soil Conservation Service.

The real estate, which originally consisted of a number of separate farms, contains several old farm houses and other buildings in various stages of disrepair. The land was purchased by the Lintons in several parcels from 1961 to 1971 and used by them in their beef raising operation. At the the time of the assignment it appeared that only one of the farms, the 326-acre Schwarz farm, possessed sufficiently sound buildings to be an independent self-contained farming operation without major reconstruction.

A memorandum prepared by the attorney for the assignee for distribution to prospective buyers provides these further details:

"State Trunk Highway 71, an all-weather highway, leads to the land. Numerous town roads lead into or traverse parts of the real estate. Interstate I-90 has an exit approximately four miles from the real estate. . . .

". . . Fort McCoy, a United States army training base, is situated approximately seven miles from the real estate. . . A cattle sales barn is located approximately seven miles from the real estate. One of the largest creameries of the State of Wisconsin is located at Sparta. The county is predominantly agricultural.

"Farmers Valley Creek and the upper reaches of the Little La Crosse River flow on the real estate. Both are trout streams. In addition, there are 12 to 15 permanent springs, and numerous intermittent springs.

". . .

"Deer, small game, quail and pheasant abound.

". . .

"The area is about forty miles from the Petenwell-Castle Rock lake system, the second largest inland lake in Wisconsin."

*"COMPOSITION OF ACRES*

". . . 1200 acres of open and woods pasture; approximately 50% open and 50% woods and pasture. Approximately 300 acres of standing timber consisting of paper or canoe birch, hickory, white and red oak, some black walnut, cherry, pine and others.

"Potential quarry sites for limestone and shale exist. Glass sand is in evidence."

The total purchase price of all the Linton land, plus the improvements made by the Lintons ($9,355), was $204,221. Accumulated depreciation of the buildings was calculated to be $40,235, leaving a tax basis of $163,886 for the 2,283 acres as of December 31, 1974.

In 1975 the 2,171 acres remaining after the single separate sale of 112 acres were assessed by the Town of Wells at 103.08 percent of recommended full value for a total of $322,150.

The major portion of the real estate was purchased by deed in the name of John Linton or in joint tenancy with Rose Marie Linton. However, approximately 914 acres was being purchased under land contract. The Tolock land contract executed in November, 1971 provided for monthly payments of $500, with a prohibition against prepayment of principal for the first five years. A part of this entire parcel of land of 544 acres was also subject to the life estate of the Tolock brothers; however there appears to be some confusion regarding how far, *i.e.,* to what property, the life interest extended. The second land contract, the one for the Schwarz farm, provided for monthly payments of $197 and contained a similar prepayment proscription which was ultimately waived by the vendors.

All of the real estate in question was encumbered by mortgages or a vendor's interest in the land contract.

Three separate judgments of foreclosure, potentially affecting approximately 1,300 acres, had already been issued: two in favor of the Federal Land Bank of St. Paul for a total of $28,000 had an expiration date of September 11, 1975 for the period of redemption; the third in favor of the First Bank of Sparta in the amount of $72,000 had a redemption time expiration date of April 9, 1976. Also, there were tax delinquencies for the years from 1972 through 1975 totaling $16,994.12. Such was the state of affairs with respect to the Linton land as of 1975.

In early May, 1975, Rose Linton and a neighbor, Douglas McCoy, met with Attorney Marvin Davis regarding the Lintons' serious financial problems. At their second meeting Davis suggested ch. 128 proceedings would be the best course of action under the circumstances and referred Mrs. Linton to Attorney Martin of the firm of Ross and Stevens in Madison, Wisconsin, for the job of drafting the necessary petition.

On May 27, 1975, the Lintons executed a voluntary assignment for the benefit of creditors. In accordance with sec. 128.05, Stats., this assignment was duly filed in the Circuit Court of Monroe county. The document, which named Attorney Jerome S. Schmidt as assignee and trustee, provided in pertinent part as follows:

"4. The property, except that noted on Schedule B as exempt, shall be held by Schmidt in trust for the following purposes:

"a. To pay all reasonable expenses, costs and charges of administering this assignment and trust; including reasonable compensation for the assignee, Schmidt, and reasonable compensation for attorneys advising and assisting Lintons in this assignment.

"b. To reduce such property to money as Schmidt may deem reasonable to effect the purposes of this trust or as this Court may direct.

"c. To pay and discharge in full, from the proceeds of the property, after deducting all necessary expenses of

administration, or so far as said proceeds shall be sufficient for said purpose, the claims of all creditors.

"d. To pay any balance thereafter remaining to the Lintons, or their successors or assigns.

". . .

"6. Schmidt, as trustee and assignee, is hereby authorized and empowered to continue the operation of the business or businesses, including without limitation any farming or farm leasing operations, of the Lintons, in any manner and for any time he deems advisable with full powers to borrow, mortgage, pledge, hypothecate or assign property in connection with the operation of said business. . . ."

Documents annexed to the assignment and incorporated by reference therein contained the following summary of debts and property:

"DEBTS

| | |
|---|---:|
| Creditors having priority | $ 1,204.57 |
| Creditors holding security | 487,982.37 |
| Creditors having unsecured claims without priority | 59,985.82 |
| Schedule A total | $549,172.76 |

"PROPERTY

| | | |
|---|---:|---:|
| Real Estate | | $246,500.00 |
| Farm equipment and farm property | | 45,000.00 |
| Personal Property not otherwise scheduled | | 291,097.00 |
| Property claimed as exempt | $34,350.00 | |
| Schedule B total | | $582,597.00" |

As stated above, on May 29, 1975, an order was entered appointing James Schmidt receiver and vesting him with the necessary authority to effect "the proper and orderly liquidation" of the property or assets of the assignors.

Mr. Schmidt subsequently retained Mr. Davis as his attorney. Davis gave notice to the Lintons of his new role as counsel for the assignee in a letter dated August 25, 1975. The letter did not specifically declare, however, that Davis could no longer represent the Lintons or that he was withdrawing as their attorney.[1] The relevant parts of the letter read as follows:

"It is necessary that you be advised that Mr. Schmidt, as far as the law is concerned, must be guided in his every action by the standard of a fiduciary with respect to creditors. As his counsel, I am guided by the same standard.
"If from time to time a disparity arises with regard to actions the receiver must take for the benefit of creditors and what your individual desires are, the former must prevail."

Shortly after Schmidt's appointment, a parcel sale of 112 acres was arranged at a price of $33,000, primarily through the efforts of the Lintons and McCoy. The proceeds were used to redeem the two foreclosed mortgages held by the Federal Land Bank of St. Paul. Next, the 2,171 acres remaining were made subject to a real estate listing contract from August 4, 1975 to September 30, 1975 with Gerrard Realty Corporation and The Wheeler Company, the two largest real estate companies in La Crosse, Wisconsin. According to a letter from Davis to the assignee Schmidt, the primary emphasis in the listing period would be to obtain a purchaser for the bulk of the land, which was listed at $600,000. Davis testified that the $600,000 list price was an arbitrary figure based solely on the amount needed to satisfy all creditors in full. However, anyone expressing interest in the land, for bulk or piecemeal sale, would be encouraged.

At the close of the listing period several written offers for parcel sales covering approximately 54 percent of

---

[1] There is no question that Attorney Davis did in fact represent the Lintons initially. This he readily admits.

the land had been received, primarily from neighboring property owners. The average net amount per acre, taking the best non-duplicative offers and deducting 10 percent broker's fee, was calculated to be $104.21 per acre.

On the basis of these disappointing results, the assignee and his attorney decided to place more emphasis on finding a bulk buyer for the land. An advertisement was consequently placed in several newspapers: Wall Street Journal (Midwest Edition), Minneapolis Tribune, Chicago Tribune, Real Estate News, La Crosse Tribune, and one of the Sparta newspapers. The La Crosse advertisement ran for one week; all the others appeared only one time. In addition, a three-page memorandum describing the property was sent to about thirty people around the country who Davis thought might be interested in the land. Several offers to purchase all 2,171 acres were received with the total price ranging from $210,000 to $325,000. None of these proposals was finalized.

On April 6, 1976, Norwood Ashley of Illinois offered to buy the entire 2,171 acres for $340,000 ($156.61 per acre). This offer was accepted by the assignee on the following day, contingent on court approval of the sale.

A petition for approval of sale was filed by the assignee in the Circuit Court for Monroe county on April 12, 1976. Consent to the sale was executed by all but one of the filing creditors pursuant to sec. 128.14, Stats. The one exception took no position on the approval of the sale.

A hearing was held on the motion on April 16, 20, 22, 28. An extensive amount of testimony was heard regarding the value of the real estate, the possibility of parcel sales, the efforts of the assignee to solicit buyers, and the representations of Mr. Davis to the Lintons concerning his role in the administration of the assignment. One hundred and fifty-eight exhibits were received. The record of the procedings reveals that the trial judge allowed the assignors great latitude in airing their grievances and presenting their case to the court.

On May 3, 1976, the trial court issued findings of fact, conclusions of law and an order approving the bulk sale of the 2,171 acres to Mr. Norwood Ashley "for the total amount of $340,000, with part of such purchase price consisting of the assumption by said Norwood S. Ashley of the current principal balance under the Ralph and Maurice Tolock, vendors, and John D. Linton, vendee, land contract. . . ." The relevant findings of fact declared as follows:

"3. That under the present circumstances, the fair value of the real estate herein is no more than $340,-000.00.

"4. That although no absolute finding is made as to fair market value of the real estate herein, the Court believes that the fair market value is probably no more than $340,000.00. That the real estate herein is assessed at full value by the Town of Wells, Monroe County, for real estate tax purposes at $312,524.00.

". . .

"9. That if the real estate herein should be subdivided into parcels, the gross amount that could be obtained is indefinite and speculative. That the net amount obtained by following said approach of subdividing into parcels is speculative; and would take anywhere from six months to several years to dispose of the real estate herein.

"10. That the net proceeds of the sale of the real estate herein in parcels thereof would not exceed the net amount that would be realized by the sale proposed in the motion.

". . .

"17. . . . . That John D. Linton and Rose Marie Linton were, at all material times, fully informed and advised by Jerome S. Schmidt and Marvin H. Davis as to all material developments in the assignment, and were free to take whatever action said John D. Linton and Rose Marie Linton deemed necessary for the protection of their own interests and rights. That the charges and allegations made by John D. Linton and Rose Marie Linton against Jerome S. Schmidt and Marvin H. Davis are the result of disillusionment on their part; and a realization reached by said John D. Linton and Rose Marie Linton in February and March, 1976, that the real estate listed

herein on Schedule B had insufficient value under all the circumstances to enable all the creditors herein and other financial obligations to be satisfied in full."

The conclusions of law provided in part as follows:

"1. That Court approval is granted with respect to the sale from Jerome S. Schmidt, Assignee, to Norwood S. Ashley at $340,000.00. . . .

". . .

"3. That Jerome S. Schmidt and Marvin H. Davis breached no duty with respect to John D. Linton and Rose Marie Linton at all material times herein."

In *Citizens Bank of Sheboygan v. Rose,* 59 Wis.2d 385, 387–88, 208 N.W.2d 110 (1973), we stated:

"It has long been established that mere inadequacy of price is not a sufficient reason for failing to confirm a sale. [Cases omitted.] There are two situations where refusal to confirm is warranted. The first is where there is an inadequate price which has resulted from circumstances such as a mistake, misapprehension, or inadvertence. [Cases omitted.] The second is where the price is so inadequate as to shock the conscience of the court. [Cases omitted.] These rules have more recently been summarized and approved by this court in numerous cases. *Gumz v. Chickering* (1963), 19 Wis.2d 625, 121 N.W.2d 279; *Barnard v. Coates* (1965), 28 Wis.2d 1, 135 N.W.2d 809; *Bihlmire v. Hahn* (1966), 31 Wis.2d 537, 143 N.W.2d 433, certiorari denied, 387 U.S. 905, 87 Sup. Ct. 1685, 18 L. Ed.2d 622; *Hales Corners Savings & Loan Asso. v. Kohlmetz* (1967), 36 Wis.2d 627, 154 N.W.2d 329; *Home Bank v. Becker* (1970), 48 Wis.2d 1, 179 N.W. 2d 855."

The decision to grant or refuse a petition to set aside a sale rests with the sound discretion of the trial court. Its order will not be reversed on review except for a clear abuse of discretion.[2]

---

[2] *John Paul Lumber Co. v. Neumeister,* 106 Wis. 243, 246, 82 N.W. 144 (1900); *Bihlmire v. Hahn,* 31 Wis. 537, 546, 143 N.W.2d 433 (1966), certiorari denied, 387 U.S. 905.

In the present case the trial court based its decision to approve the bulk sale of the property for an amount of $340,000 on findings that under the circumstances the fair value of the real estate was no more than $340,000. We have previously held that a finding that the sale price represented the "fair value" of the property meant that the trial court implicitly found the price was not so inadequate as to shock its conscience. *First Wis. Nat. Bank of Oshkosh v. KSW Inv.*, 71 Wis.2d 359, 364, 238 N.W.2d 123 (1976). It would appear from the record in this case that this language also implicitly embodies the further finding that the selling price was "fair and adequate."[3]

The contract of sale approved by the trial court provided for a total selling price of $340,000 for the 2,171 acres or $156.61 per acre. The written offers from neighboring property owners for parcel sales, considered inadequate by both the assignors and the assignee, covered only 54 percent of the property and would net an average of about $104 per acre. Of the few other offers to purchase the entire 2,171 acres in bulk, the highest was $325,000 and the lowest $210,000. The trial court also specifically noted that for real estate tax purposes full value of the property was assessed at $312,524. While two realtors appraised the property at approximately $500,000, these figures were highly speculative, representing the gross value of the land divided, improved, marketed and sold in parcels. No witnesses testified or even intimated that a price of

---

[3] It must be noted that approval of the use of the term "fair value" here is not intended to suggest that the applicable standard is the "fair value" standard in sec. 846.165(2), Stats., relating to an application for confirmation of sale in the case of mortgaged premises which sell for less than the amount due. The established rules outlined above are still the appropriate standard for the exercise of the trial court's discretion.

$340,000 was inadequate or even merely less than the market value for a bulk sale of such magnitude.

The property also had several major disadvantages and deficiencies which diminished its value and "salability." First, the Tolock land contract involving 544 acres contained a prohibition against prepayment of principal which the vendors refused to waive. Second, some part of this property was also subject to the life interest of the Tolock brothers. Third, only one parcel of the 2,171 acres possessed adequate farm buildings; the buildings on the other parcels were in complete disrepair. The trial court's implicit findings that the selling price of $340,000 was neither unfair or inadequate nor so inadequate as to shock the conscience is well-supported by the record and not an abuse of discretion.

Because the order approving the sale should be affirmed, it is not necessary to reach the appellants' further argument that mistakes and irregularities surrounding the sale contributed to the inadequate price. Nevertheless, we believe some comments concerning certain of the alleged irregularities cited by appellants are appropriate.

The Lintons argue that the assignee failed to make sufficient efforts to sell the real estate in parcels. This argument must be rejected for several reasons. The evidence strongly suggests that parcel sales in the present circumstances would be both difficult and costly. Mr. Gerrard, an experienced realtor, identified several of the numerous problems and expenses involved in such a course: (1) large capital investment; (2) property clean-up costs; (3) surveying costs; (4) cost of roads; (5) maintenance of a sales organization or real estate holding company; (6) holding costs, including interest and taxes; (7) sales commissions and advertising

costs; (8) the length of time (which he set at five to ten years) needed to sell all the parcels; (9) the unsteadiness of the recreational real estate market; (10) the great likelihood in the present case that the carrying charges would exceed the income from the land. The trial court's finding that the net proceeds from sales of the real estate in parcels would not exceed the net amount realized by the bulk sale proposed in the motion is not clearly erroneous.

It should also be noted that a parcel sales plan if extended over any significant length of time would raise serious legal questions. While the court may authorize a receiver or assignee to continue the operation of a business under certain circumstances,[4] as a general rule it is inadvisable to operate business for long because of added expenses and financial risk. Furthermore, the assignee is under an obligation to execute the trust within a reasonable time.

The appellants, Lintons, contend that the sale must be set aside because the assignee failed to obtain an appraisal of the property. An appraisal of assets is not required under ch. 128, Stats. While prudent practice would generally recommend obtaining an appraisal by competent appraisers, it was unnecessary under the facts of this case since sufficient other evidence of the value of the property was presented.

The record contains conflicting evidence on the issue of whether and when Attorney Davis informed the Lintons both of his acceptance of the position as counsel for the assignee and of his withdrawal as their attorney. The trial court found in favor of Attorney Davis

[4] *Harrigan v. Gilchrist*, 121 Wis. 127, 99 N.W. 909 (1904); Moskowitz, *Creditors' Action in Wisconsin*, Institute of Continuing Legal Education for Wisconsin (1975).

on this matter. The trial judge had the opportunity to assess the credibility of the witnesses (whose stories in this case were diametrically opposed), it cannot be said that the trial court's conclusion is against the great weight and clear preponderance of the evidence.

We do note, however, that the general rule is that a trustee or receiver should not ordinarily employ the attorney who represents the bankrupt. *See* Annot. 79 A.L.R.2d 760, 770. *See also Harrigan v. Gilchrist, supra,* 121 Wis. at 389, where the court found no great impropriety under the facts of the case but nonetheless concluded—"[i]f Mr. Hayden was to commence the receivership action, it was, of course, proper that he should first sever his relations as attorney for the insolvent. Probably it were better had he retained such relations and let some other attorney commence the action. . . ."

While the rule is not uniform throughout the United States,[5] we believe that the assignee is the trustee for both the debtor and the creditors; with the duty to administer the trust property so as to pay the creditors, as far as possible, their just claims, and then to account to the debtor for the surplus. The object and purpose of assignment law is to afford an equal distribution of the assignor's estate to all creditors in proportion to their claims.[6] During the whole course of the trust the assignee is therefore bound to look primarily to the interests of the creditors.[7] The appellants-assignors incorrectly argue that the trial court concluded that the assignee had no duty to the assignors. This is not so. The court implicitly recognized that the assignee had a

[5] 6A C.J.S., *Assign. Ben. Cred.,* p. 921, sec. 85.

[6] *In re Assignment of Sherry,* 101 Wis. 11, 18, 76 N.W. 611 (1898).

[7] *Geisse v. Beall,* 3 Wis. 330 (*367) (1854).

duty to the assignors. It simply found on the evidence that he had not breached it.

The record does not compel a finding that irregularities and inadequate performance by the trustee resulted in an inadequate sale price.

*By the Court.*—Order affirmed.