BNP Paribas as Agent,
Plaintiff-Appellant-Petitioner,

v.

Olsen's Mill, Inc.,
Defendant-Respondent.

Supreme Court

*No. 2009AP1007. Oral argument March 2, 2011.
—Decided July 8, 2011.*

2011 WI 61

(Also reported in 799 N.W.2d 792.)

For the plaintiff-appellant-petitioner there were briefs by *Brady C. Williamson, Katherine Stadler, Patricia L. Wheeler* and *Godfrey & Kahn, S.C.* and *Joseph J. Wielebinski* and *Munsch Hardt Kopf & Harr, P.C,* and oral argument by *Mr. Williamson.*

For the defendant-respondent there was a brief by *Thomas M. Olejniczak, Colleen M. Kelly, Patrick M. Blaney* and *Liebmann, Conway, Olejniczak & Jerry, S.C.* and oral argument by *Mr. Olejniczak.*

¶ 1. ANN WALSH BRADLEY, J. The petitioner, BNP Paribas as Agent ("Paribas"), seeks review of an unpublished opinion of the court of appeals affirming an order of the circuit court.[1] Paribas and Olsen's Mill entered into a voluntary assignment agreement for the benefit of creditors under Wis. Stat. ch. 128.[2] The circuit court ordered the sale of certain assets free and clear of all liens to Olsen's Mill's Acquisition Company, LLC ("OMAC").

¶ 2. As a secured creditor, Paribas argues that the circuit court erred by ordering the sale of its collateral free and clear of Paribas's security interest without its consent. Additionally, it contends that the sale impermissibly contravened the order of distribution of the proceeds of a debtor's estate set forth in Wis. Stat. § 128.17(1).

¶ 3. We conclude that the circuit court erred by ordering the sale of Paribas's collateral free and clear of Paribas's security interest without its consent. However, because the value of Paribas's security interest in the assets sold is unclear on this record, we are unable to discern if Paribas was harmed as a result of this error. We further determine that the court contravened the statute by approving an offer that circumvented the order of distribution mandated by Wis. Stat. § 128.17(1). Accordingly, we reverse the court of appeals and remand to the circuit court for a determination of what remedy is available under the circumstances.

---

[1] *BNP Paribas v. Olsen's Mill, Inc.*, No. 2009AP1007, unpublished slip. op. (Wis. Ct. App., June 30, 2010). The court of appeals entered a summary disposition pursuant to Wis. Stat. § 809.21 affirming an order of the circuit court for Green Lake County, William M. McMonigal, J.

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

## I

¶ 4. In 2009, Olsen's Mill, Inc. was one of the largest grain elevators in Wisconsin. Olsen's Mill's largest creditor was a French bank, BNP Paribas, which had extended Olsen's Mill an $80 million line of credit. It is undisputed that Paribas had a properly perfected security interest in certain assets of Olsen's Mill including equipment, real estate, inventory, and general intangibles. It is likewise undisputed that at the time Olsen's Mill defaulted on its obligations to Paribas, approximately $58 million was due and owing on the loan. It is unclear from the record, however, what part of the $58 million represented a secured interest.

¶ 5. Olsen's Mill had a number of creditors in addition to Paribas. Baylake Bank had a properly perfected security interest in certain assets. Olsen's Mill also had a number of unsecured creditors, including local businesses and farmers.

¶ 6. On February 11, 2009, Paribas and Olsen's Mill entered into a written agreement for an assignment for the benefit of creditors under Wis. Stat. ch. 128. The circuit court approved the assignment and appointed Michael S. Polsky as interim receiver of Olsen's Mill's estate pursuant to Wis. Stat. § 128.08(1)(b).

¶ 7. In a document entitled "Agreed Order Appointing Interim Receiver and Granting Other Relief," the court ordered that the receiver "shall have full management authority for Olsen's assets" and shall "hold said property pending this action with the usual powers and duties of a receiver under Chapter 128." It provided that the receiver "is hereby authorized to sell any and all of Olsen's property free and clear of all liens, with all liens attaching to the proceeds of sale, through

431

public or private proceedings, in a commercially reasonable manner, subject to the prior consent of the creditors holding perfected liens of the assets being sold, and the approval of the Court."

¶ 8. Shortly thereafter, the receiver requested authority to sell certain assets, including inventory and owned equipment.[3] He averred that "[t]he sale of Olsen's assets is subject to the consent of BNP Paribas and BNP Paribas has authorized the Receiver to represent to this Court that BNP Paribas consents to the relief requested in this Sale Motion." He moved the court for authority to sell the assets "in accordance with the proposed procedures set forth in the Auction Terms and Procedures to be established by the Receiver with the consent of BNP Paribas."

¶ 9. The receiver submitted a document setting forth the agreed-upon terms and procedures for the auction (hereinafter, "Auction Terms Agreement"). In relevant part, it provided that all sales of secured assets "shall be free and clear of all liens, claims and encumbrances, with any and all liens, claims and encumbrances attaching to the proceeds of sale in the order of their priority." It gave the secured creditors the option to withhold consent to "the final bid for any particular Lot":

> The sale of the Assets that are subject to properly perfected liens in favor of Debtor's lenders . . . shall be subject to the consent of such Lenders, as to the specific collateral securing such Lender's claims. The Lenders and the Receiver reserve the right to reject the final bid for any particular Lot [] and to decline to sell any of the Assets in such Lot at the Auction.

---

[3] The receiver did not seek authority to sell other assets. Accordingly, after the auction, the unsold assets would remain in Olsen's Mill's estate under the receiver's management.

¶ 10. The Auction Terms Agreement specified that "[a]ll bids are subject to approval of the Court." It further specified that the receiver had authority to accept a "Winning Bid" and that he would ask the court to approve the "Winning Bid":

> If the Receiver agrees, in consultation with the Lenders, to accept a Tentative Winning Bid for the purchase of any Lot (a 'Winning Bid'), he shall do so at the conclusion of the Auction, and the Receiver shall use his best efforts to have the Court enter an Order authorizing the Receiver to (a) consummate the sale of that Lot pursuant to the terms of the Winning Bid, . . . . No Winning Bid is binding on the Receiver or the Debtor until the Court enters an Order approving the sale of the Assets included in such Lot pursuant to such Winning Bid.
>
> The Receiver will ask the Court to approve the best offer for the Lots, with the right of the Receiver to accept and close on the sale with the next highest bidder, as set forth below, if the party making the best offer fails to timely close.

¶ 11. The Auction Terms Agreement did not contemplate that the court could accept any bids submitted outside the auction procedures. Likewise, it did not provide that the court could approve a bid over a secured creditor's objection to the sale of its collateral.

¶ 12. The auction was held on April 7, 2009, with ten registered bidders present. Two frontrunners emerged. Olsen's Mill Acquisition Corporation (OMAC), which was headed by Phillip J. Martini, was affiliated with Olsen's Mill's prior management. PRM Wisconsin, LLC (PRM) was affiliated with the secured creditor, Paribas.

¶ 13. A total of 22 bids were submitted during five rounds of bidding. During the auction, the penultimate

bid was submitted by OMAC, and PRM submitted the final bid. The receiver concluded that the "highest and best bid" was the final bid submitted by PRM, and he designated it as the Winning Bid.

¶ 14. The receiver described PRM's Winning Bid as follows: $9,000,000 for all owned inventory; $6,500,000 for all owned equipment and real estate; and PRM shall cause Paribas "to agree to fund certain loans or authorize the use of its cash collateral, up to $2,710,000, for outstanding checks due to various farmers and producers and other post-petition accounts payable." The receiver also reported that PRM "informed the Receiver that Buyer will offer employment to substantially all of the current employees of Olsen's."

¶ 15. The receiver's report advised that PRM's Winning Bid was "in excess of the liquidation value of Olsen's assets" and that he believed "that the proposed sale described above is in the best interests of Olsen's creditors and all parties-in-interest." He reported that Paribas "has consented to the Winning Bid described above, and has agreed to release its liens . . . on the assets described above upon payment to BNP in cash of the net sale proceeds from all such sales." He requested the court's approval of PRM's Winning Bid.

¶ 16. At the hearing held the day after the auction, the receiver explained his reasons for concluding that the Winning Bid was the highest and best. He noted that the Winning Bid was $400,000 higher than the bid submitted by OMAC during the auction. Further, he explained, he could not accept OMAC's auction bid because it was contingent upon Paribas's agreement to release OMAC from any liability in connection with its acquisition of the assets:

> Release of a cause of action in favor of a third party, Paribas, is not something that I had the ability to

deliver, is not something that was in the lot offered for sale and, in fact, was in direct violation of the bid procedures. The bid procedures clearly provided that all bids must be unconditional.

¶ 17. The attorney for Olsen's Mill opined that PRM's Winning Bid was not in the best interest of the creditors because, he asserted, it would be difficult for Paribas to operate the mill as a going concern. Later in the hearing, he asked the court to elicit and accept instead a revised offer from OMAC:

> I think we've got a real good competing bidder that's a real bidder that can put the whole thing together . . . and indeed is ready, I think, to meet the bid here on the table today except he's got all the pieces together and it won't require a liquidation of all the corn which would severely disrupt the business of the ongoing Olsen's Mill, Inc. or its successor.[4] So for those reasons, Your Honor, we believe that [PRM's Winning Bid] should not be approved and this Court should order the receiver to go back and strong-arm these parties and see if something can't be worked out here.

¶ 18. The receiver contended that he had no authority to make Paribas, a secured creditor, consent to a sale of its security interest: "In [a] Chapter 128 proceeding, if a secured creditor is to receive less than the full amount due and owing, that secured creditor needs to consent to the sale. That has always been the rule. And the bid procedures and amended bid procedures in this case specifically require the consent of the secured creditors."

---

[4] Martini testified that if the court accepted his bid, he would merge the assets of Olsen's Mill and Olsen Brothers and would operate the business as a combined grain facility. He testified that there would be no liquidation of the stored corn.

435

¶ 19. He further explained that Paribas "has consented to the proposed sale to PRM Wisconsin. Paribas as agent has not consented to the bid submitted by Mr. Martini. I can't do anything as a receiver to make them or to compel them to consent to that bid, just like I can't compel them to give a release for other claims that they have."

¶ 20. Before the court made any decisions, counsel for Olsen's Mill announced that he intended to file a petition for bankruptcy in federal court. The court adjourned the hearing. After the federal court dismissed Olsen's Mill's bankruptcy petition, the hearing before the circuit court was reconvened on April 14, 2009.

¶ 21. From the outset of the April 14 hearing, it was apparent that the circuit court was interested in ordering the receiver to sell the assets to OMAC. The court said: "As attractive as the PRM bid is, the concern that the Court has is whether or not it will, in fact, result in an ongoing business or will, in fact, simply result in a liquidation." "When I inject the element of equity," the court explained, there might be an obligation to "evaluate on balance which bid may in fact be higher and better, all things considered."

¶ 22. Throughout the hearing, the parties argued about whether the court had authority to approve OMAC's revised offer in the place of the Winning Bid selected by the receiver and consented to by the secured creditors. The attorney for Olsen's Mill argued that the circuit court could and should approve OMAC's revised offer: "Equity needs to be done, all the creditors' interests, you have to balance this somehow." He urged the court to consider the interests of the community: "This is a terrible position you're in, but there's a big balance here, and there's a lot of other creditors in this case that

I think the Court is cognizant, very cognizant of that. I probably don't even need to point this out." The court responded: "I only have to look over your head."

¶ 23. Paribas's attorney objected to the proposed sale to OMAC: "Just to make the record clear, I understand crystal clear what direction the Court is leaning and which way the Court may order. I just want on the record that Paribas does not consent, for whatever that means within the scope of the Court order. Just so everybody's clear on that."

¶ 24. The attorney for Baylake Bank, a second secured creditor, also objected. He argued: "for [the attorneys] to say to you, it's within your power to do equity and to spread these competing offers around as far as possible, it ignores a secured creditor's rights under Chapter 409." He concluded: "in sum, the Court is bound by statutes nonetheless and cannot simply do what is fair and equitable for all parties."

¶ 25. The receiver asserted that OMAC's revised offer could not be accepted because it would upset the priority order in the statutes and also because Paribas would not consent:

> The problem at the end of the day is that BNP Paribas as agent has a 58 million dollar claim. If it receives 5 million dollars as a value of this claim, it still has a 53 million dollar unsecured claim in this case. And while other unsecured claims, forward contracts and prepaid expenses, under Mr. Martini's proposal, are being paid one hundred percent, BNP Paribas as agent's unsecured claim of over fifty million dollars, is receiving nothing. And that [] offer, is not acceptable to BNP Paribas.

¶ 26. Additionally, the receiver expressed concern that the terms of OMAC's revised offer were nebulous because they had emerged piecemeal during the course

437

of the hearing before the court. The court adjourned to allow for further negotiation.

¶ 27. When the hearing was reconvened later that day, OMAC submitted a three-page handwritten bid that included the following terms: $6.5 million for all real estate, rolling stock, leased and owned equipment; $9 million for all inventory; and other consideration in the form of a commitment to honor all checks and obligations to certain producers, a commitment to honor all forward contracts of producers, a commitment to honor prepaid inventory of producers, and a commitment to honor all pre- and post-petition trade accounts payable. OMAC specified that it was not obligated to pay the $9 million for inventory upfront, but rather, it would pay as the inventory was sold off or within 180 days of closing.

¶ 28. In response, the receiver alerted the court to additional problems raised by OMAC's revised offer. First, he explained, "Paribas has not consented to finance the sale of its collateral over this period of time, which is a separate problem." Second, he explained that the offer would disrupt the priority scheme set forth in Wis. Stat. § 128.17 for the distribution of assets to various creditors:

> What OMAC has proposed is that . . . certain general unsecured claims of the buyer's choice be paid in full while others get nothing, and while claims of a higher priority, taxes, wages, administrative expenses, may or may not get paid in full.
>
> . . .
>
> My concern is if, for example, there are post-petition taxes, payroll taxes—I don't know if there are. . . . I don't know if there's wage claims. I don't know if there's vacation claims. I don't know what employment claims there may be. All of which have priority over general

unsecured claims. And to me the core of the problem is that picking and choosing certain general unsecured pre-petition claims to pay in full . . . and leaving everybody else at zero, I think is a problem.

¶ 29. As the court and parties waded through the specifics of OMAC's revised offer in detail, Paribas's attorney again objected:

[W]e don't think the Court can approve this offer because of our lack of consent, which is required under the statute. . . . And so where I think we end up, Your Honor, is we go through a lot of the details and specifics, but we get to a situation where you're gonna be faced with a much more difficult question on whether you can cram this offer into Chapter 128 without the consent of the lenders. . . . So I wanted to at least let you know that now and not let my silence somehow constitute consent and to raise it with you at this point.

¶ 30. The circuit court concluded that the negotiations had produced "an enhanced second offer that has met and exceeded the original offer that the Court was being asked to approve." Without specifically addressing any statutory text, the court approved OMAC's revised offer because it "works for the balanced interest of those who are entitled to be protected." "If I can't do what I've been attempting to do or I can't do what I've been asked to do," the court determined, "then the whole purpose of Chapter 128 would seem to be out the window. And I'm not about to buy that."

¶ 31. The court ordered the receiver to accept OMAC's revised offer. In its written decision, it found as a fact that Paribas had a security interest in certain assets of Olsen's, which included equipment, real estate, inventory, and general intangibles. Further, it found that Paribas did not consent to the sale of its collateral free and clear of its security interest:

[Paribas] has a properly perfected security interest in certain assets of Olsen's (including equipment, real estate, inventory and general intangibles), does not consent to the OMAC Offer described above, or the sale of the Subject Assets in accordance therewith and has not agreed to release its liens and security interests on the assets described above.

¶ 32. The court "overruled" the receiver's recommendation and Paribas's objections to OMAC's revised offer, and it concluded that "the sale of the Subject Assets by the Receiver to OMAC pursuant to the OMAC Offer will constitute a valid, legal and enforceable transfer to OMAC of all right, title and interest of the Receiver to the Subject Assets, free and clear of all liens, claims and encumbrances." The court determined that the payments received by Paribas for inventory would be "in partial satisfaction of its secured claim."

¶ 33. The court's written decision acknowledged that the receivership would continue after the closing, given that certain assets of Olsen's Mill had not been included in the sale. It explained: "The Receiver shall continue to administer all assets of the receivership estate other than the Subject Assets, including, without limitation, accounts receivable, contract rights, cash, the tax refund owed to Olsen's, any avoidance actions and all other claims or causes of action of Olsen's or the receivership estate . . . except any preference actions against producers, which will not be pursued by the Receiver."

¶ 34. From the record and the circuit court's findings of fact, it is clear that the sale included equipment, real estate, and inventory, and that Paribas held a security interest in these assets. It is unclear, however, whether Paribas held a security interest in any of the other assets that were sold.

¶ 35. Paribas asked that the judgment be stayed pending appeal. The circuit court denied the motion. Paribas then filed a petition for a supervisory writ and a motion for emergency relief in the court of appeals and also in this court. These requests were denied.

¶ 36. On appeal, the court of appeals affirmed in an unpublished summary disposition. *BNP Paribas v. Olsen's Mill, Inc.,* No. 2009AP1007, unpublished slip. op. (Wis. Ct. App., June 30, 2010). A central premise of the court of appeals' opinion was that Wis. Stat. ch. 128 permits a circuit court to value a secured creditor's security interest, and that the circuit court had valued Paribas's collateral at $9 million. *Id.* at 4. Because Paribas had been paid $9 million, the court of appeals concluded that Paribas's arguments were moot. *Id.*

## II

■

¶ 37. We are required to determine whether the circuit court erred under Wis. Stat. ch. 128 and other applicable law when it ordered the sale of Paribas's collateral without Paribas's consent and approved the distribution of proceeds from the sale. Resolution of these issues requires statutory interpretation. We interpret statutes independently of the interpretations rendered by the circuit court and the court of appeals. *Martin v. Am. Fam. Mut. Ins. Co.,* 2002 WI 40, ¶ 11, 252 Wis. 2d 103, 643 N.W.2d 452.

## III

¶ 38. Although Wis. Stat. ch. 128 was created in 1937,[5] there are relatively few appellate cases devoted to its interpretation. We begin with an overview of the laws governing proceedings under chapter 128. Next,

---

[5] *See* § 2, ch. 431, Laws of 1937.

we turn to applying those laws to evaluate whether the circuit court erred when it ordered the sale of Paribas's collateral without its consent and approved the distribution of the proceeds from the sale. Finally, we discuss issues related to remedy.

A

¶ 39. Chapter 128, which governs assignments for the benefit of creditors, provides a state law alternative to federal bankruptcy. It sets forth a statutory scheme under which a debtor's assets may be liquidated and the proceeds distributed to creditors in an orderly and controlled manner. *See* Charles G. Center, et al, *Wisconsin Business Advisor Series: Collections and Bankruptcy* § 4.2.16 (2006). Wisconsin Stat. § 128.01 provides that "the circuit courts shall have supervision of proceedings under this chapter and may make all necessary orders and judgments therefor and all assignments for the benefit of creditors shall be subject to this chapter."

¶ 40. To initiate the assignment, the debtor designates an assignee who files the assignment with the clerk of court. *See* Wis. Stat. § 128.02. Upon the court's approval of an assignment, the assignee is "vested with the powers of a receiver" and is ordered to "administer the debtor's estate pursuant to" chapter 128. Wis. Stat. § 128.05(1).

¶ 41. To effectively administer the debtor's estate, the receiver must determine the debtor's assets and liabilities. Therefore, the receiver is required to file a correct inventory of any assets and a list of creditors, setting forth the amount due each creditor.[6] Wis. Stat. § 128.13. Creditors are given notice of the proceedings,

---

[6] The receiver's inventory is not included in the record before this court.

and unsecured creditors are required to timely file their claims against the debtor's estate. Wis. Stat. § 128.14; Wis. Stat. § 128.15(2).

¶ 42. With permission of the court, the receiver may sell assets and distribute the proceeds of the sale. Often, the proceeds will be insufficient to satisfy all debts and obligations. Accordingly, Wis. Stat. § 128.17(1) mandates the order of distribution of the proceeds.[7]

¶ 43. There are significant differences in the treatment of secured creditors and general unsecured creditors under chapter 128. Unsecured creditors have no property interest in the debtor's assets, and they cannot withhold consent to the sale of the estate's assets. Further, unsecured creditors are entitled to distribution of any proceeds of a sale only after priority claims have been satisfied. *See* Wis. Stat. § 128.17(1); *Collections and Bankruptcy, supra,* § 4.2.23.

¶ 44. We explained in *Wisconsin Brick & Block Corporation v. Vogel,* 54 Wis. 2d 321, 326, 195 N.W.2d

---

[7] Wisconsin Stat. § 128.17(1) provides that "[t]he order of distribution out of the debtor's estate shall be as follows":

(a) The actual and necessary costs of preserving the estate subsequent to the commencement of the proceedings.

(b) Costs of administration including a reasonable attorney's fee for the representation of the debtor.

(d) Wages . . . which have been earned within 3 months before the date of the commencement of the proceedings . . . .

(e) Taxes, assessments and debts due the United States, this state or any county, district or municipality.

(f) Other debts entitled to priority.

(g) Debts due to creditors generally, in proportion to the amount of their claims, as allowed.

(h) After payment of the foregoing, the surplus, if any, shall be returned to the debtor.

664 (1972), that "[a] secured creditor under ch. 128 cannot have his security taken away from him without his consent." Without the secured creditor's consent to the sale of its collateral, "the court [does] not have the power in the ch. 128, Stats., proceeding to sell the property free of the [secured creditor's] mortgage[.]" *Id.* at 329.

¶ 45. This explanation recognizes the assertion advanced by Paribas at the outset of its oral argument. It asserted: "To decide this case, this court need not depart from the undisputed facts, the statutory commands of ch. 128, and the most basic legal principles of secured transactions. The foremost of those principles is that a court cannot compromise, cannot eliminate, cannot depreciate a secured interest without the consent of the interest holder."

¶ 46. An example of this assertion lies in a security interest in inventory governed by the Uniform Commercial Code, Wis. Stat. ch. 409. The general rule under that chapter is that a secured creditor must consent before its collateral may be sold free and clear of liens: "A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof *unless the secured party authorized the disposition free of the security interest or agricultural lien.*" Wis. Stat. § 409.315(1)(a) (emphasis added); *see also* Cristina M. Choi & Margaret E.M. Utterback, *Wisconsin Secured Transactions Under Revised Article 9 of the Uniform Commercial Code* § 8–1 (rev. ed. 2010) (explaining that § 419.315(1)(a) sets forth a "general rule" with many exceptions).[8]

---

[8] A lien is a "legal right or interest that a creditor has in another's property, lasting [usually] until a debt or duty that it secures is satisfied." *Black's Law Dictionary* 933 (7th ed. 1999).

¶ 47. Wisconsin Stat. § 128.18 governs the validity of liens when there has been an assignment for the benefit of creditors. Under some circumstances, a receiver may determine that a lien on the debtor's property is void or may be dissolved, such as when the lien was given in an attempt to circumvent the order of distribution set forth in chapter 128.[9] By contrast, those liens "given or accepted in good faith and for a present consideration which have been properly recorded or filed *shall*, to the extent of such present consideration only, *not be affected by the provisions of [chapter 128]*." Wis. Stat. § 128.18(4) (emphasis added).

¶ 48. Accordingly, when a lien given and accepted in good faith meets the conditions set forth in § 128.18(4), it is "not [] affected by" the provisions of chapter 128. As one commentator has explained, "there is no question that a receiver's ability to sell collateral depends on the secured creditor's consent." Paul A. Lucey, *The Liquidating "Chapter 11" in State Courts*, Am. Bankr. Inst. J., Feb. 2001, at 12.

¶ 49. Attorney Lucey compared the great power that bankruptcy trustees may wield over secured creditors with the lesser authority wielded by a receiver appointed under state law:

---

[9] For example, Wis. Stat. § 128.18(3)(b)3 provides that liens created within four months before the filing of an assignment shall be dissolved if the lien "was sought and permitted in fraud of the provisions of this chapter." Wisconsin Stat. § 128.18(5) provides that "[a]ll conveyances, transfers, assignments or encumbrances of a debtor's property" given by the debtor within four months prior to the filing of a petition "with the intent and purpose on the debtor's part to hinder, delay, or defraud any of the debtor's creditors shall be void as against the debtor's creditors except as to purchasers in good faith and for a present fair consideration."

> A bankruptcy trustee can use collateral, even cash collateral, over the objection of a secured creditor if that creditor's interests are adequately protected under [provisions of the bankruptcy code]. *There is no comparable power under state receivership law.* If the secured creditor in a receivership wants to take its ball and go home, the game is over.
>
> Similarly, while there may be a division of authority as to whether a bankruptcy court can authorize the sale of assets under [federal bankruptcy law] over the objection of a secured creditor, there is no question that a receiver's ability to sell collateral depends on the secured creditor's consent.

*Id.* (emphasis added).

█

¶ 50. Wisconsin statutes, case law, and commentary are in accord. A secured creditor may withhold its consent to the sale of its collateral in a chapter 128 proceeding. If it does, the court cannot order the sale of the collateral free and clear of the secured creditor's lien.

¶ 51. In other situations, however, a secured creditor "may readily agree to administration and liquidation of collateral in a chapter 128 proceeding because this is often an economical means of realizing on collateral." *Collections and Bankruptcy, supra,* § 4.2.20. If the secured creditor does consent to the sale free and clear of its security interest, it is entitled to the proceeds of the sale of its collateral in order of priority.

¶ 52. When the value of the secured creditor's collateral is uncertain or in dispute, Wis. Stat. § 128.25 sets forth a procedure by which its value may be determined.[10] The secured creditor may determine the value

---

[10] Wisconsin Stat. § 128.25 is the Uniform Act Governing Secured Creditor's Dividends in Liquidation Proceedings.

through collection (if the security is an obligation to pay money) or by creditor's sale (if the asset is something other than the payment of money). Wis. Stat. § 128.25(5). Alternatively, it may be determined by compromise if a petition is filed and the secured creditor and the liquidator agree upon value, by litigation, or by liquidator's sale. Wis. Stat. § 128.25(6).[11]

## B

■

¶ 53. Having set forth the chapter 128 procedures, we turn to applying them to the facts of this case. It is undisputed that Paribas had a properly perfected security interest in certain assets of Olsen's Mill, including equipment, real estate, inventory, and general intangibles.[12] Therefore, under Wis. Stat. § 128.18(4), Paribas's lien on these assets was "not [] affected by" the

---

[11] Additionally, regardless of whether a secured creditor consents to liquidation of its collateral, the secured creditor may make a claim against the debtor's estate for any deficiency. Wisconsin Stat. § 128.15(2) provides: "Claims of secured creditors may be allowed to enable such creditors to participate in the proceedings but shall be allowed for such sums only as shall be proved to be due, over and above the value of the securities, and dividends shall be paid only upon the excess of the claim over the value of the security at the time of the commencement of the proceedings."

Wisconsin Stat. § 128.25(4) provides that the value of the debtor's security is credited against the secured creditor's total claim: "Dividends paid to secured creditors shall be computed only upon the balance due after the value of all security not exempt from the claims of unsecured creditors and not released or surrendered to the liquidator, is determined and credited upon the claim secured by it."

[12] Circuit Court's finding of fact #14. In its brief to this court, OMAC acknowledged that "there is no dispute that

provisions of chapter 128. According to *Wisconsin Brick & Block*, "the court did not have the power in the ch. 128 [] proceeding" to sell the collateral free of Paribas's security interest without Paribas's consent. 54 Wis. 2d at 329.

■

¶ 54. Although OMAC initially acknowledges the need for consent by a secured creditor, it contends that Paribas's participation in the chapter 128 proceedings constituted consent under these facts. It argues that by virtue of Paribas's initiation and participation in the receivership proceeding, Paribas had already provided consent to the sale of its collateral free and clear of all liens. It contends that no further consent was required from Paribas. For this proposition, OMAC quotes a portion of this court's decision in *Wisconsin Brick & Block*.

¶ 55. In that case, the debtor made a voluntary assignment for the benefit of creditors under chapter 128. 54 Wis. 2d at 323. The secured creditor, which held a mortgage on the debtor's property, had not appeared in the chapter 128 proceedings and did not file any claim based on its mortgage. *Id.* On review, this court determined that because the secured creditor had not participated in the proceedings, the circuit court had no authority to sell the property free of the mortgage.

¶ 56. In making this determination, we stated: "As a general rule the court has the power under ch. 128, Stats., to sell the assignor's property free of valid liens and encumbrances if the lienholder participates in the proceeding." *Id.* at 326. In *Wisconsin Brick & Block*,

[Paribas's] liens fall squarely within the criteria established by § 128.18(4); its liens were given to secure indebtedness and then evidenced and perfected by appropriate UCC financing statements."

this court focused on the role of participation because the secured creditor had not participated in the proceedings. Without participation, the secured creditor could not have consented to the sale.

¶ 57. The *Wisconsin Brick & Block* court held that a secured creditor's participation in the receivership proceeding was necessary to establish consent. It should not be read to suggest that the secured creditor's participation was sufficient, by itself, to establish consent. Likewise, it should not be read to suggest that the creditor's participation in the proceedings trumps the secured creditor's express objection to the sale of its collateral. OMAC reads the quoted language from *Wisconsin Brick & Block* out of context.

¶ 58. Here, Paribas consented to a sale of the secured assets under the procedures outlined in the Auction Terms Agreement. However, the court accepted an offer that was not submitted during the auction, was not submitted in accordance with the Auction Terms Agreement, and was not selected by the receiver.

¶ 59. During the hearing, Paribas's attorney raised multiple objections to the proposed sale to OMAC. Early in the hearing, he told the court that Paribas did not consent to the sale of its collateral: "I just want on the record that Paribas does not consent, for whatever that means within the scope of the Court order. Just so everybody's clear on that." Later in the hearing, Paribas's attorney again objected to the sale of the collateral: "[W]e don't think the Court can approve this offer because of our lack of consent, which is required under the statute. . . . So I wanted to at least let you know that now and not let my silence somehow constitute consent and to raise it with you at this point."

¶ 60. Given Paribas's repeated assertions that it did not consent to the sale of its collateral, the circuit

449

court made a finding of fact. It found that Paribas "[did] not consent to the OMAC Offer described above, or the sale of the Subject Assets in accordance therewith and has not agreed to release its liens and security interests on the assets described above." Under these circumstances, the circuit court erred by ordering a sale of Paribas's collateral free and clear of Paribas's security interest without its consent.

■

¶ 61. OMAC advances an alternative argument for why we should affirm despite Paribas's lack of consent. It asserts that the circuit court valued Paribas's security interest during the proceedings at $9 million, and Paribas received $9 million as a result of the sale. Therefore, OMAC contends, Paribas was not injured as a result of the sale.

¶ 62. To understand OMAC's argument, we must look to the transcript of the circuit court proceedings. In its revised offer, OMAC set the purchase price for Olsen's Mill's inventory at $9 million. This was the same purchase price offered by PRM in its Winning Bid. OMAC points to a portion of the transcript where the receiver discussed the effect that OMAC's proposed purchase price would have on the largest creditor, Paribas:

> Paribas' claim is approximately sixty million dollars. As a result of this proposed sale [to OMAC], that amount will be reduced by approximately nine million dollars. That leaves them with an unsecured deficiency claim of over 51 million dollars plus costs, plus interest. They are the unsecured creditor pool here, Your Honor.

¶ 63. OMAC contends that the receiver's comments in this portion of the transcript constitute the receiver's valuation of Paribas's collateral. It argues

that Paribas's failure to object to this valuation is fatal, and that Paribas was entitled to no more than it received, $9 million.

¶ 64. There are at least three problems with this argument. First, it is doubtful that the receiver's comments analyzing the effect of OMAC's proposed purchase price on Paribas's claims constitute a "valuation" of the inventory, as that term is used in Wis. Stat. ch. 128. That statute sets forth several distinct procedures by which a secured creditor's security interest may be valued.[13] OMAC makes no attempt to interpret the statutory requirements or to identify any statutory subsection into which the receiver's purported valuation fits.

¶ 65. Indeed, it does not appear to fit squarely within any of the subsections. There was no collection

---

[13] The relevant sections of Wis. Stat. § 128.25 provide:

(5) Determination of value by secured creditor.

(a) By collection. When the asset constituting the security is an obligation for the payment of money, the secured creditor may determine the security's value by collection . . . .

(b) By creditor's sale. When the asset constituting the security is something other than an obligation for the payment of money, the secured creditor may determine its value by creditor's sale.

(6) Alternative Determinations of Value. Where valuation under sub. (5) is impractical or would cause undue delay, the court, upon petition by either the secured creditor or the liquidator, may order the value of the security determined by any of the following methods:

(a) By compromise, if the secured creditor and the liquidator agree upon a value. . . .

(b) By litigation, through proceedings in the liquidation proceeding. . . .

(c) By liquidator's sale of the assets which, when completed and approved by the court, shall pass to the purchaser good title, free and clear of all liens of the secured creditor, such liens to be transferred to the proceeds of the sale. . . .

or creditor's sale, as described in sub. (5). Further, there was no petition for a determination of value, as described in sub. (6).

¶ 66. Second, the $9 million reflects the purchase price for Olsen's Mill's inventory only. Yet, Paribas's security interest extended beyond inventory, encompassing equipment, real estate, general intangibles, and other assets.[14] The circuit court's order for sale and distribution reflected that the $9 million payment for inventory resulted in only "partial satisfaction" of Paribas's secured claim.

¶ 67. During oral argument, it became apparent that the full value of Paribas's security interest was unknown. Paribas's attorney asserted that the value of Paribas's security interest must have exceeded $9 million because OMAC was willing to pay over $20 million for the business as a going concern. He contended: "[The secured assets] were undoubtedly worth more than the $9 million that [Paribas] received, and their value was far less than the total amount of the debt."[15]

¶ 68. Because the value of Paribas's security interest is unclear on this record, we are unable to fully

---

[14] During oral argument, Paribas's attorney pointed to the security agreement in which Olsen's Mill granted Paribas a security interest in many assets, including accounts, chattel paper, commercial tort claims, documents, general intangibles, investment property, inventory, and supporting obligations.

[15] Paribas asserts that "there can be no question that the nature and extent of [its] security interest was contractual and, thus, governed by the Loan Documents and Wisconsin's UCC Article 9. In other words, [its] security interests could not be properly determined . . . without regard to the Loan Documents, but rather by resorting exclusively to Chapter 128's provisions pertaining to valuation of a secured creditor's deficiency claim."

452

address OMAC's alternative argument. We are unable to determine whether its security interest in the assets that were sold was fully satisfied as a result of the sale, as OMAC contends.

■

¶ 69. The third problem with OMAC's alternative argument is even more significant. Even if the proceedings in the circuit court could be considered to have produced a "valuation" of Paribas's collateral under Wis. Stat. § 128.25(5) and (6), the circuit court's order violated the statutes in other ways. That is, even if Paribas's secured interest had been satisfied, Paribas appears to have received nothing on the unsecured portion of the debt.

¶ 70. As discussed above, Wis. Stat. § 128.17(1) mandates the order of distribution of the proceeds of a liquidation sale when those proceeds are insufficient to satisfy the estate's debts and obligations. Section 128.17(1) enumerates certain unsecured priority claims that must be satisfied first, including the costs of administering the estate, wages, and taxes. Once those claims are satisfied, any remaining proceeds are distributed pro rata. The remaining proceeds are distributed to general unsecured creditors "in proportion to the amount of their claims." Wis. Stat. § 128.17(1); *see also Linton v. Schmidt,* 88 Wis. 2d 183, 198, 277 N.W.2d 136 (1979) ("The object and purpose of assignment law is to afford an equal distribution of the assignor's estate to all [unsecured] creditors in proportion to their claims.").

¶ 71. Even if the secured portion of Paribas's claim had been properly valued at $9 million, then Paribas would have had an unsecured deficiency claim of approximately $49 million. Under the order of distribution set forth in Wis. Stat. § 128.17(1), Paribas would have

been entitled to a pro rata portion of any money that remained in the estate after priority payments were made.

¶ 72. In this case, however, the revised offer accepted by the circuit court had the effect of circumventing the order of distribution mandated by Wis. Stat. § 128.17(1). In addition to enumerating a purchase price for inventory and a purchase price for real estate, rolling stock, and equipment, OMAC's revised offer included a commitment to honor various debts Olsen's Mill owed to general unsecured creditors. Specifically, OMAC agreed to pay checks and obligations to certain producers, forward contracts of producers, prepaid inventory of producers, and trade accounts payable.

¶ 73. According to the estimates of the parties, these combined obligations totaled somewhere around $10 million. The circuit court's order of sale allowed this $10 million to go directly to specified unsecured creditors. The circuit court contravened the statute by approving an offer that circumvented the order of distribution mandated by Wis. Stat. § 128.17(1).[16]

## C

██

¶ 74. Having determined that the circuit court erred by ordering the sale of Paribas's collateral without its consent and approving the distribution of the pro-

---

[16] Paribus makes several additional assertions of error. It contends that its due process rights were violated. Additionally, it asserts that by permitting OMAC to pay the purchase price for inventory over a six-month period, the circuit court effectively ordered Paribas to extend OMAC an interest-free loan. Because we resolve this appeal on other grounds, we do not address these arguments.

ceeds from the sale, we turn to the issue of remedy. In its initial brief, Paribas asked us to, in effect, unwind the sale. It requested us to order the circuit court to reinstate Paribas's liens on the collateral that was sold pursuant to the circuit court's order and to order a new auction. In addition, it asked us to order a trial to determine any money damages that Paribas has incurred.

¶ 75. The sale of Paribas's collateral occurred more than two years ago. At this late date, restoring the parties to the actual position they were in prior to the sale may be neither practical nor possible.

¶ 76. It appears that Paribas recognizes the difficulty of fashioning a remedy at this point. At oral argument, its attorney explained: "Clearly the bank knows that its alternatives, practical alternatives, are limited. It does not expect to recover 58 million less nine, or 51 million dollars. But the fact that a remedy may require some creative thinking, might require a little bit of unorthodox approach, it should not deter this court from correcting an error of law."

¶ 77. Paribas has revised its requested remedy. Rather than requesting an order to unwind the sale, it now asks this court to remand to the circuit court and order that court to fashion a remedy:

> The remedy is a remand, and it would be for the trial court to decide . . . . Granted, this is not a case where this court can say reversed, reversed and remanded with instructions. It is going to take a little bit of work. But we can't start at the end and work to the beginning. We can't just say gee, a remedy might be a little tough here. Let's try a remedy that corrects the error of law and does a better job of restoring the parties to the position they should have been in. In other words, let's not let the perfect be the enemy of the good. And the importance of establishing some clear law in this area just should not be underestimated.

455

¶ 78. We agree that under the situation presented here, this court is poorly equipped to fashion an appropriate remedy.[17] As discussed above, we are unable to determine the value of Paribas's security interest at the time of the sale. If that determination can be made at this late date, the circuit court is in the best position to collect the necessary evidence and make the necessary findings of fact.

¶ 79. Further, this court does not have the benefit of a developed factual record of what has transpired since the sale. According to the circuit court's order, the receiver was to continue to manage certain assets of the debtor's estate after the sale. At oral argument, the parties explained that the receivership continues to this day. The record before this court does not reflect what assets remain in the estate or their value.

¶ 80. Finally, we note that throughout the proceedings in the circuit court, there were references to a New York lawsuit filed by Paribas against the Olsen brothers, who had guaranteed the loan. It is unclear

---

[17] As previously mentioned, in its brief, Paribas specifically requested three remedies: (1) that its liens "on all collateral sold and/or transferred" be reinstated; (2) that we "order a new auction of Olsen's Mill's (now OMAC) assets to be conducted as a going-concern business" and "OMAC could then assert a claim against the receivership estate"; and (3) money damages.

Paribas no longer appears to request those remedies. Rather, it now argues that this court is poorly equipped to determine what remedies may be appropriate under the circumstances:

This business is very important to this part of the state, it is a very large operation, and from the distance of 150 miles or so, I do not think that this court is the right entity to be fashioning specific remedies. But the fact is we do not know the value of what is left, we do not yet know the value of [Paribas's security interest], but we do know there was value there.

what effect, if any, that lawsuit would have on the appropriate remedy.

¶ 81. We agree with Paribas that the task of fashioning a remedy is best left for the circuit court. Accordingly, we remand to the circuit court for a determination of what remedy is available under the circumstances. On remand, the circuit court should take all necessary and appropriate actions to determine the existence of a remedy that is fair to all parties under the circumstances.

¶ 82. OMAC argues that "because of the inherent complexity of insolvency proceedings, the statute, if little else, emphasizes the need for the Circuit Court to have broad powers to handle the intricate issues that arise so that it may orderly administer the assets sequestered before it." We agree that a circuit court has authority under the statutes to withhold approval of a bid that had been selected by the receiver. *See* Wis. Stat. § 128.01. We also agree that a circuit court should take into account equitable considerations when making an order in a chapter 128 proceeding. *See id.* Nevertheless, in exercising these powers, the circuit court is not free to violate the applicable statutes. A party's express statutory rights cannot be ignored or disregarded.

¶ 83. In sum, we conclude that the circuit court erred by ordering the sale of Paribas's collateral free and clear of Paribas's security interest without its consent. However, because the value of Paribas's security interest in the assets sold is unclear on this record, we are unable to discern if Paribas was harmed as a result of this error. We further determine that the court contravened the statute by approving an offer that circumvented the order of distribution mandated by Wis. Stat. § 128.17(1). Accordingly, we reverse the court

of appeals and remand to the circuit court for a determination of what remedy is available under the circumstances.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 84. DAVID T. PROSSER, J., did not participate.

¶ 85. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). Although I agree with the lead opinion that a reverse and remand is the proper disposition, I do not join the opinion. I write in concurrence to clarify that it is BNP Paribas's (Paribas) secured interest in the assets that the circuit court sold to Olsen's Mill Acquisition Company (OMAC) over Paribas's objection and the circuit court's approval of a sale that failed to pay Paribas anything on its unsecured claim while other unsecured creditors were paid that drive the result that we must reach in our review of the ch. 128 (2007–08)[1] proceeding now before us.

¶ 86. Paribas repeatedly refused to consent to the sale to OMAC of assets in which Paribas held perfected security interests, alleging that it was not fully compensated for the value of its security in those assets. In addition, Paribas received nothing on its unsecured claims, while other unsecured claimants were paid. Accordingly, I conclude that the circuit court violated the provisions of ch. 128 and exceeded its authority in regard to the sale to OMAC in two major respects: (1) it approved the sale of assets in which Paribas held a security interest free and clear of all liens, without either Paribas's consent or the completion of a statutory determination of the value of Paribas's security in the assets

---

[1] All further references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

sold and payment for the value of its security; and (2) it approved the sale to OMAC that paid Paribas nothing on its unsecured claims while other unsecured claimants were paid.

¶ 87. With these conclusions established, I would remand to the circuit court to determine an appropriate remedy consistent with ch. 128. Accordingly, I respectfully concur.

## I. BACKGROUND

¶ 88. Paribas is a secured lender of Olsen's Mill, a major grain elevator operation, with sites throughout Wisconsin. Paribas loaned Olsen's Mill approximately $58 million for which Paribas took a second mortgage on certain real estate and secured interests in the following collateral:

> all Accounts; all Bank Accounts; all Chattel Paper; all Commercial Tort claims; all Deposit Accounts; all Documents; all General Intangibles; all Instruments, including all Commodity Accounts and Commodity Contracts; all Inventory; all Investment Property; all Payment Intangibles; all Supporting Obligations; all books and records pertaining to the Collateral, including, any computer software, hardware and access codes[]; and to the extent not otherwise included, all Proceeds and products of any and all of the foregoing.

Security Agreement, at 2. Paribas timely perfected its security interest in its collateral.[2]

¶ 89. Olsen's Mill defaulted on its obligations to Paribas, and Paribas then filed the ch. 128 proceeding that is now before us. Olsen's Mill agreed to Paribas's

---

[2] There was no question raised in this proceeding that Paribus did not timely perfect its security interests in its collateral.

request for the appointment of a receiver to take control of and to preserve Olsen's Mill's ch. 128 estate. Michael S. Polsky was appointed receiver.

¶ 90. The parties agreed upon the order that appointed Polsky, which order provided that the receiver was empowered:

> to sell any and all of Olsen's property free and clear of all liens, with all liens attaching to the proceeds of sale, through public or private proceedings, in a commercially reasonable manner, *subject to the prior consent of the creditors holding perfected liens on the assets being sold,* and the approval of the Court.

(emphasis added).

¶ 91. As part of Polsky's duties to Olsen's Mill's ch. 128 estate, he sent out notice of an April 7, 2009 auction of certain of Olsen's Mill's assets.[3] The notice was in accord with the agreed upon order quoted in ¶ 6, above. The Auction Procedures noticed certain restrictions on the sale, including that Olsen's Mill's assets were subject to perfected security interests, including those of Paribas, and that the assets' sales were subject to the consent of the secured parties, for the assets in which a party held security.

¶ 92. The description of Auction Lots was very broad, including:

> All owned real estate; All owned equipment; All owned inventory (including prepaid inventory); All owned grain inventory; All owned non-grain inventory (including prepaid inventory); Belmont owned equipment;

---

[3] Polsky did not seek to auction all of Olsen's Mill's assets. Apparently, some intangibles such as accounts receivable, life insurance policies, licensed software, etc. remained in the possession of Polsky and not subject to sale.

Boscobel owned equipment; Milwaukee owned equipment; Ripon/Metomen owned equipment; Viroqua owned equipment; Algoma owned real estate and equipment (Oshkosh operation); Auroraville owned real estate and equipment; Berlin owned real estate and equipment; Newton/Westfield owned real estate and equipment; Omro owned real estate (4 lots); Stockton/Stevens Point owned real estate and equipment; Warren owned [] and equipment; All other owned equipment (not included in lots 7–19); Real estate leases with Olsen Bros. Enterprises; All rolling stock and equipment owned by Olsen Leasing, LLC; Intangible assets; Any combination of lots 2 through 22.

Paribas held perfected security interests in many of these assets and second mortgages on certain real estate. Baylake Bank and Capital Crossing held the first mortgages and primary security on the real estate and certain equipment.

¶ 93. The highest bid, $18,210,000, was submitted by PRM Wisconsin, LLC (PRM), an entity affiliated with Paribas. The second highest bid was submitted by OMAC, an entity affiliated with the then current owners of Olsen's Mill. In the PRM bid, $9,000,000 was allocated to inventory, $6,500,000 was allocated to all owned equipment and real estate and $2,710,000 was to cover outstanding checks due to various farmers and producers. Paribas was to receive the $9,000,000 for inventory, "in partial satisfaction of its secured claim." Baylake Bank and Capital Crossing received "full satisfaction of [their] secured claim[s]."

¶ 94. At the hearing to confirm the sale, Polsky informed the court that the conditions of the Auction Procedures had been followed; that the purchase price was in excess of the liquidation value of the assets; that the secured creditors had consented; and that PRM was

ready to proceed in closing on the sale. Polsky asserted that the sale to PRM was in the best interests of creditors and all other interested parties.

¶ 95. Olsen's Mill objected to the sale, and requested that OMAC be permitted to make an alternative offer outside of the Auction Procedures. Ultimately, the circuit court did as Olsen's Mill requested; it permitted a new offer and accepted that offer.

¶ 96. Under OMAC's offer, although Paribas was paid $9 million for its interest in inventory, the payment was not due until six months after the sale. Paribas was paid nothing on its unsecured claim that could approach $50 million, while the unsecured claims of grain producers for future purchases received $5 million.

¶ 97. Paribas refused to consent to the sale, and Polsky objected as well. Polsky informed the court that OMAC's proposal violated ch. 128 because it would give the buyer's choice of unsecured claims payment in full, while other unsecured claimants would get nothing. Polsky also pointed out that claims of a higher priority, such as taxes, wages and administrative expenses would not be fully funded under OMAC's proposal. He also brought to the court's attention that Paribas had not consented to the sale of assets in which it held a perfected security interest and it had not consented to financing OMAC's purchase of the inventory during the six-month period after closing on the sale.

¶ 98. The circuit court heard the objections of Paribas and Polsky and noted that Paribas had properly perfected security interests in certain assets and that it did not consent to the sale to OMAC and did not consent to the release of its liens and security interests on the items sold. However, notwithstanding the objections made and noted by the circuit court, the circuit court transferred all of the sale assets to OMAC, free and clear of all liens.

¶ 99. Paribas appealed, and the court of appeals affirmed. We granted review and now reverse and remand.

## II. DISCUSSION

### A. Standard of Review

¶ 100. This case requires us to interpret and apply ch. 128 in regard to the sale of Olsen's Mill's assets to OMAC, under undisputed facts. The interpretation and application of statutes in light of undisputed facts present questions of law that we decide independently, but benefitting from the discussions in previous court decisions. *Admanco, Inc. v. 700 Stanton Drive, LLC,* 2010 WI 76, ¶ 15, 326 Wis. 2d 586, 786 N.W.2d 759.

### B. Chapter 128 Principles

¶ 101. Under ch. 128, an insolvent debtor makes a voluntary assignment for the benefit of the debtor's creditors. Wis. Stat. § 128.01. A court then may sequestrate the property of the debtor and appoint a receiver to administer that property. Wis. Stat. § 128.08; *Admanco,* 326 Wis. 2d 586, ¶ 32.

¶ 102. During the course of administration, ch. 128 proceedings address objections made to claims against the debtor's estate, Wis. Stat. § 128.15, and provide for the orderly distribution of an insolvent debtor's property. Wis. Stat. § 128.17.

¶ 103. A creditor with a perfected security interest in the debtor's property is not required to participate in a ch. 128 proceeding. *Wis. Brick & Block Corp. v. Vogel,* 54 Wis. 2d 321, 325–26, 195 N.W.2d 664

(1972).[4] The value of a secured party's perfected security in each asset of the debtor's ch. 128 estate is protected, and it is only the excess that is above that value that is subject to administration, absent a secured party's consent. *See Kneeland v. Am. Loan & Trust Co.,* 136 U.S. 89, 97 (1890) (explaining vested contract rights in a receivership); *see also* Wis. Stat. § 128.18(4).

¶ 104. As we have explained, "[a] secured creditor under ch. 128 cannot have his security taken away from him without his consent," and a secured creditor is not required to participate in a ch. 128 proceeding. *Wis. Brick,* 54 Wis. 2d at 325–26. However, if a secured creditor chooses to participate in a ch. 128 proceeding, his claim against the debtor's estate is limited to the unsecured portion of what the debtor owes because the portion of the debt that is secured cannot be defeated by the ch. 128 administration. *Id.* at 326; *see also Kneeland,* 136 U.S. at 97.[5] In addition, a secured party who chooses to participate in a ch. 128 proceeding must give notice of his security interest and object to any sale that attempts to diminish the value of his security because the court's decision in regard to distribution of the debtor's estate cannot be challenged in a collateral proceeding asserting the secured interest. *Littlejohn v. Turner,* 73 Wis. 113, 123, 40 N.W. 621 (1888).[6]

---

[4] The secured creditor did not participate in the receivership proceeding in *Wisconsin Brick & Block Corp. v. Vogel,* 54 Wis. 2d 321, 195 N.W.2d 664 (1972).

[5] Stated otherwise, a creditor who has full or excessive security for an outstanding debt will not choose to participate in a ch. 128 proceeding because he will be making no claim against the general fund of the receivership, which general fund pays unsecured claims.

[6] The present ch. 128 is somewhat different from the statutes in place when *Littlejohn v. Turner,* 73 Wis. 113, 40 N.W.

¶ 105. Although a ch. 128 insolvency proceeding is sometimes referred to as a "state bankruptcy,"[7] a ch. 128 insolvency proceeding differs from a federal bankruptcy proceeding in significant respects. For example, a debtor's obligations are not discharged in a ch. 128 proceeding.[8] *Voluntary Assignment of Tarnowski,* 191 Wis. 279, 286, 210 N.W. 836 (1926). Therefore, when there are insufficient assets to pay all creditors, the debtor's obligation to the creditors remains after the conclusion of a ch. 128 proceeding.

¶ 106. However, even though a secured creditor with a perfected lien cannot have his security taken from him without his consent, Wis. Stat. § 128.18(4), when a secured creditor chooses to participate in a ch. 128 proceeding, ch. 128 provides a procedure somewhat similar to cram down[9] under the federal Bankruptcy

---

621 (1888), was decided. However, the concept that a secured creditor who chooses to participate in a ch. 128 proceeding is to give notice of its perfected security interest in property of the estate remains valid. *See Premke v. Pan Am. Motel, Inc.,* 35 Wis. 2d 258, 267, 151 N.W.2d 122 (1967); Wis. Stat. § 128.25.

[7] *See* Jeffrey L. Murrell, *Chapter 128: Wisconsin's Bankruptcy Alternative,* Wisconsin Lawyer, May 2008, at 8.

[8] The validity of ch. 128 proceedings ordering a receiver to take control of and administer property of a debtor has been challenged by a claim that the federal government has preempted the field with the federal Bankruptcy Act. *Gelatt v. DeDakis,* 77 Wis. 2d 578, 580, 254 N.W.2d 171 (1977). That challenge was set aside in part by suspending a past provision of ch. 128 that discharged the debt of the debtor in a ch. 128 proceeding. *Id.* at 585 (citing *Voluntary Assignment of Tarnowski,* 191 Wis. 279, 210 N.W. 836 (1926)).

[9] Cram down refers to the power of a federal bankruptcy court under 11 U.S.C. § 1129(b)(1) to compromise the security of a secured creditor when the court determines that the holders of secured interests receive the "indubitable equivalent

Act.[10] In this regard, a ch. 128 proceeding may be held to determine the value of a participating secured party's security in each asset in which such an interest is held and for which the secured creditor seeks payment out of the general fund for that part of his claim that is unsecured. Wis. Stat. § 128.25(5) and (6).

¶ 107. When an asset in which a perfected security interest is held is for the payment of money, a secured party who chooses to participate in the ch. 128 proceeding can determine the value of his security by executing against the obligation to pay. Wis. Stat. § 128.25(5). All or some portion of his debt may be satisfied by execution.

---

of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii); *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD)*, 634 F.3d 79, 87 (2d Cir. 2011).

[10] Wisconsin Stat. § 128.25 is a uniform law: The Uniform Act Governing Secured Creditors' Dividends in Liquidation Proceedings. Wis. Stat. § 128.25(10). The history of this uniform act relates the act's intended parallels with the federal Bankruptcy Act,

> The purpose of taking security is primarily for protection in the event of insolvency. The determination of the adequacy of security is, therefore, vitally affected by these rules. It likewise affects the evaluation of all other claims, present or prospective, that may depend for payment upon the general assets of the debtor. Uniformity is accordingly desirable for the benefit of interstate business generally.
>
> Legislation on this subject in all English speaking countries has generally followed the principle of the bankruptcy rule.
>
> This principle has therefore been adopted in this act as being the only one likely to be generally accepted by the Legislatures of the several states.

Unif. Act Governing Secured Creditors' Dividends in Liquidation Proceedings, Commissioners' Prefatory Note, 9C U.L.A. 77, 78 (1941).

¶ 108. Or in the alternative, a secured party or a receiver may petition the court to determine the value of a secured party's interest in each asset in which a secured party who chooses to participate in the ch. 128 proceeding has a perfected security interest. Wis. Stat. § 128.25(6). Valuation of secured interests may be obtained by compromise, § 128.25(6)(a); by litigation, § 128.25(6)(b); or by a receiver's sale, § 128.25(6)(c). All of the actions taken under § 128.25(5) and (6) are subject to court approval. Therefore, although a secured creditor who chooses to participate in a ch. 128 proceeding cannot be forced to accept a sale of estate property in which he has a perfected lien if the sale price will not fully satisfy the value of his security interest in the property sold, how to ascertain the value of that security interest when the secured party claims under the general fund is provided by statute.[11] *See* Wis. Stat. § 128.25.

## C. Paribas's Secured Interest

¶ 109. Olsen's Mill owed a debt of approximately $58 million to Paribas. Paribas chose to participate in

---

[11] The lead opinion quotes heavily from Paul A. Lucey's two page article, *The Liquidating "Chapter 11" in State Court,* 20 Am. Bankr. Inst. J. 12 (Feb. 2001), to make broad sweeping statements that could be interpreted as contrary to Wis. Stat. § 128.25. Lead op., ¶¶ 48–49. I do not find Paul Lucey's article persuasive. He cites no authority and provides not one footnote to support his assertions.

This writer could find only one case that cites to the Uniform Act Governing Secured Creditors' Dividends in Liquidation Proceedings, which is the name the Wisconsin legislature adopted from the National Uniform Law Commission and gave to Wis. Stat. § 128.25. *Hamberg v. Guaranteed Mortgage Co. of New York,* 38 N.Y.S.2d 165 (S. Ct. N.Y. 1942), mentions the Act, but only to explain that it does not apply to the problem under review by the court. *Id.* at 174–75.

the ch. 128 proceeding now before us. It had a perfected security interest in many of Olsen's Mill's assets.[12] However, from the record before us we cannot determine the value of Paribas's security interest in the assets that were sold or in the assets that remain under the administration of the receiver because no Wis. Stat. § 128.25(6) proceedings were held in circuit court.[13]

¶ 110. Paribas and the receiver petitioned the circuit court to accept the sale to PRM, which action may fall within Wis. Stat. § 128.25(6)(a) as a compromise to determine the value of Paribas's security interest in some of the assets. However, the circuit court refused their compromise. Because the court then summarily accepted OMAC's offer to purchase, no litigation was conducted to determine the value of Paribas's security interest in the assets that were sold to OMAC.

¶ 111. Accordingly, the record before us does not answer the questions of how much of the $58 million owed to Paribas was secured by those assets that were sold and how large Paribas's unsecured claim against the general fund was. Without Paribas's consent to the sale, or a Wis. Stat. § 128.25(6) determination of the value of Paribas's security in the assets sold and that payment for the value of its security was accorded to Paribas, the circuit court contravened the provisions of ch. 128 when it approved the sale to OMAC free and clear of all liens.

---

[12] *See* ¶ 4 above.

[13] Furthermore, neither the receiver's inventory (Wis. Stat. § 128.15(1)(a)) nor the debtor's inventory (Wis. Stat. § 128.13) is in the record before us. Therefore, we have not been provided a framework from which to determine the total assets of Olsen's Mill before the sale, indicating the security interests levied against each asset. Such a framework would have been helpful to us in instructing the circuit court on remand.

¶ 112. On remand, the circuit court should deter-mine the value of Paribas's security in the assets sold to OMAC, at the time of the sale. The circuit court then can determine whether the value of Paribas's security was taken from it without its consent or payment for the value of its security due to the sale, contrary to *Wisconsin Brick* and Wis. Stat. § 128.18(4). The circuit court then also will be able to determine the value of Paribas's unsecured claim against the general fund of the receivership.

## D. Paribas's Unsecured Claim

¶ 113. The sale of Olsen's Mill's assets to OMAC provided Paribas with only $9 million against a debt of approximately $58 million. In addition, the $9 million that it received for inventory was not due to be paid until six months after the sale.[14] Although it is not possible on the record before us to determine the amount of Paribas's unsecured claim, it appears to be significant.

¶ 114. Distributions of property from the debtor's estate are controlled by Wis. Stat. § 128.17, which separates debts into classes with varying degrees of priority. Section 128.17 provides in relevant part:

---

[14] I can see no lawful basis for requiring Paribas to finance OMAC's purchase for six months. In so doing, the circuit court approved a sale that actually paid Paribas less than $9 million for its secured interest in inventory. While it is possible under some circumstances to charge the proceeds from the sale of an asset with the expenses of a sale that are attributable to the asset sold, *see Thomsen v. Cullen,* 196 Wis. 581, 588, 219 N.W. 439 (1928), that is not what occurred here. There is no basis in the record before us for this charge against the payment to Paribas for its perfected security in the inventory.

Order of distribution. (1) The order of distribution out of the debtor's estate shall be as follows:

a. The actual and necessary costs of preserving the estate subsequent to the commencement of the proceedings.

b. Costs of administration including a reasonable attorney's fee for the representation of the debtor.

c. [Omitted from the statute]

d. Wages, including pension, welfare and vacation benefits, due to workmen, clerks, traveling or city salespersons or servants, which have been earned within 3 months before the date of the commencement of the proceedings, not to exceed $600 to each claimant.

e. Taxes, assessments and debts due the United States, this state or any county, district or municipality.

f. Other debts entitled to priority.

g. Debts due to creditors generally, in proportion to the amount of their claims, as allowed.

h. After payment of the foregoing, the surplus, if any, shall be returned to the debtor.

¶ 115. Paragraph (1)(g) addresses the distribution to unsecured creditors. It requires that the payment of unsecured creditors must be a proportionate payment. Compliance with the statute requires an aggregation of the amount of all unsecured claims that are allowed and then payment of each claim in an amount proportional to the total amount of all unsecured outstanding claims from whatever assets are available to satisfy these claims.

¶ 116. Because the record before us does not permit us to know the priority in which Paribas's security attached to assets that were sold, we cannot determine the amount of Paribas's unsecured claim in the assets

470

that were sold to OMAC. However, with a payment of $9 million, which was not due for six months after closing on the sale, against a debt of $58 million and Paribas having only a second mortgage on the real estate sold, some significant portion of Olsen's Mill's debt to Paribas must have been unsecured.

¶ 117. The purpose of a ch. 128 proceeding is to provide an orderly distribution of the insolvent debtor's property, which is not encumbered by liens, to all unsecured creditors. As we explained in *Linton v. Schmidt,* 88 Wis. 2d 183, 277 N.W.2d 136 (1979), "The object and purpose of assignment law is to afford an equal distribution of the assignor's estate to all creditors in proportion to their claims." *Linton,* 88 Wis. 2d at 198.

¶ 118. The circuit court did not even consider by what amount the $58 million that Olsen's Mill owed to Paribas was unsecured. The circuit court was not free to order a sale that did not treat all creditors equally in proportion to their unsecured claims. *Id.* Accordingly, in regard to Paribas's interests, the sale to OMAC contravened Wis. Stat. § 128.17(1)(g).

## III. CONCLUSION

¶ 119. I conclude that the circuit court violated the provisions of ch. 128 and exceeded its authority in regard to the sale to OMAC in two major respects: (1) it approved the sale of assets in which Paribas held a security interest free and clear of all liens, without either Paribas's consent or the completion of a statutory determination of the value of Paribas's security in the assets sold and payment for the value of its security; and (2) it approved the sale to OMAC that paid Paribas nothing on its unsecured claims while other unsecured claimants were paid.

¶ 120. With these conclusions established, I would remand to the circuit court to determine an appropriate remedy consistent with ch. 128. Accordingly, I respectfully concur.

¶ 121. I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN join in this concurrence.