# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1728 & 2019AP2063 |

| | |
|---|---|
| COMPLETE TITLE: | In re:<br>The Atrium of Racine, Inc., d/b/a The Atrium and Bay Pointe:<br><br>Marilyn Casanova , member of Creditor Committee, Audrey J. Fox, member of Creditor Committee, Dr. Melvin Miritz, member of Creditor Committee, Linda Miritz, member of Creditor Committee, Edward and Louise Langleib Trust, member of Creditor Committee, Carleton Musson, member of Creditor Committee, Wilma Milovancevic, member of Creditor Committee, Helen Taylor, member of Creditor Committee, Louis P. Teicheret Trust, member of Creditor Committee, Reverend Frederick Marks, member of Creditor Committee, Jewel Marks, member of Creditor Committee, Patricia Meier, member of Creditor Committee, Patricia Teernstra, member of Creditor Committee, Andrew Mikaelian, member of Creditor Committee, Marcella Mikaelian, member of Creditor Committee, Josephine Brooks, member of Creditor Committee, Evelyn Odell, member of Creditor Committee, Laurence Freer, member of Creditor Committee, Dorothy Kohl, member of Creditor Committee, Karen Boerger, member of Creditor Committee, Jacqueline Williamson, member of Creditor Committee, Judy Glowinski, member of Creditor Committee, Anne Tredwell, member of Creditor Committee, Marilyn Baham, member of Creditor Committee, Elsie Gotzman, member of Creditor Committee, Lucille Ciaramita, member of Creditor Committee, Joanne Ramaker, member of Creditor Committee, Johanna Sander, member of Creditor Committee, Thomas Eser, member of Creditor Committee, Henryetta Eser, member of Creditor Committee, Grace Nelson, member of Creditor Committee, Jane Odders, member of Creditor Committee, David Nelson, member of Creditor Committee, Ray Katt (deceased), member of Creditor Committee, Louise Katt, member of Creditor Committee, Ethel Hader, member of Creditor Committee, Warren Larsen, member of Creditor Committee, Ellen Larsen, member of Creditor Committee, Frances Scott, member of |

Creditor Committee, Susan Prouty, member of Creditor Committee, Robert Rainey, member of Creditor Committee, Patricia Rainey, member of Creditor Committee, Helen Eckheart, member of Creditor Committee, Wilma Wise, member of Creditor Committee, Earl Christianson, member of Creditor Committee and Marian Bloch, member of Creditor Committee,

                Appellants,

Var Krikorian, Ruth Minton, Richard Minton, Walter Steidl, Irene Miller, Marian Kornwolf, Marjorie Speckhard, Delores Torphy, Geraldine Baumblatt, Joan Peterson, John Rowland, Julianne Rowland, Lorraine Pavelcik, Marilyn Iselin, Metta Reiker, Prudence White, Elaine Oetlinger, Esther Wulff, Helen Veenstra, Rev. Dr. Ross Henry Larson, Fred and Nancy Flofer, Winifried Wiser, Nazaly Bagdasian, Robert Callaway, Estate of Elaine Zlevor, Marshall Cushman, Bernard Braun, Patricia Braun, Bob Ottum, Holly Ottum, Joyce Ottum, Jeanne Haas, Gloria Murphy, Ralph Anderson, Doris Beuttler, Genevieve Hostak, Marlene Weichmann, Mary Mueller, Wood Family Trust and Mary Holtz,

                Claimants-Appellants,

      v.

Michael S. Polsky, Esq. , Receiver and The Bank of New York Mellon Trust Company, N.A.,

                Respondents-Petitioners.

---

In re:
The Atrium of Racine, Inc., d/b/a The Atrium and Bay Pointe:

Marilyn Casanova, member of Creditor Committee, Audrey J. Fox, member of Creditor Committee, Dr. Melvin Miritz, member of Creditor Committee, Linda Miritz, member of Creditor Committee, Edward and Louise Langleib Trust, member of Creditor Committee, Carleton Musson, member of Creditor Committee, Wilma Milovancevic, member of Creditor Committee, Helen Taylor, member of Creditor Committee, Louis P. Teichert Trust, member of Creditor Committee, Reverend Frederick Marks, member of Creditor Committee, Jewel Marks, member of Creditor Committee, Patricia Meier, member of Creditor Committee, Patricia Teernstra, member of Creditor Committee, Andrew Mikaelian, member of Creditor Committee,

2

Marcella Mikaelian, member of Creditor Committee, Josephine Brooks, member of Creditor Committee, Evelyn Odell, member of Creditor Committee, Laurence Freer, member of Creditor Committee, Dorothy Kohl, member of Creditor Committee, Karen Boerger, member of Creditor Committee, Jacqueline Williamson, member of Creditor Committee, Judy Glowinski, member of Creditor Committee, Anne Tredwell, member of Creditor Committee, Marilyn Baham, member of Creditor Committee, Elsie Gotzman, member of Creditor Committee, Lucille Ciaramita, member of Creditor Committee, Joanne Ramaker, member of Creditor Committee, Johanna Sander, member of Creditor Committee,
Thomas Eser, member of Creditor Committee, Henryetta Eser, member of Creditor Committee, Grace Nelson, member of Creditor Committee, Jane Odders, member of Creditor Committee, David Nelson, member of Creditor Committee, Ray Katt (deceased), member of Creditor Committee, Louise Katt, member of Creditor Committee, Ethel Hader, member of Creditor Committee, Warren Larsen, member of Creditor Committee,Ellen Larsen, member of Creditor Committee, Frances Scott, member of Creditor Committee, Susan Prouty, member of Creditor Committee, Robert Rainey, member of Creditor Committee, Patricia Rainey, member of Creditor Committee, Helen Eckheart, member of Creditor Committee, Wilma Wiser, member of Creditor Committee, Earl Christianson, member of Creditor Committee, Marian Bloch, member of Creditor Committee, Jan Teichert, member of Creditor Committee, Dorothy Nelson, member of Creditor Committee, Metta Reiker, member of Creditor Committee, Prudence White, member of Creditor Committee, Elaine Oetlinger, member of Creditor Committee, Esther Wulff, member of Creditor Committee, Helen Veenstra, member of Creditor Committee, Mark H. Larson, Successor Trustee of the Ross H. Larson and Willetta J. Larson Revocable Trust of 2015, member of Creditor Committee, Fred Hofer, member of Creditor Committee, Nancy Hofer, member of Creditor Committee, Winifred Wiser, member of Creditor Committee, Nazaly Bagdasian, member of Creditor Committee, Robert Callaway, member of Creditor Committee, Estate of Elaine Zlevor, member of Creditor Committee, Marshall Cushman, member of

3

Creditor Committee, Var Krikorian, member of Creditor Committee, Ruth Minton, member of Creditor Committee, Richard Minton, member of Creditor Committee, Walter Steidl, member of Creditor Committee, Irene Miller, member of Creditor Committee, Marian Kornwolf, member of Creditor Committee, Marjorie Speckhard, member of Creditor Committee, Delores Torphy, member of Creditor Committee, Geraldine Baumblatt, member of Creditor Committee, Joan Peterson, member of Creditor Committee, John Rowland, member of Creditor Committee, Julianne Rowland, member of Creditor Committee, Lorraine Pavelcik, member of Creditor Committee, Marilyn Iselin, member of Creditor Committee, Bernard Braun, member of Creditor Committee, Patricia Braun, member of Creditor Committee, Bob Ottum, member of Creditor Committee, Holly Ottum, member of Creditor Committee, Joyce Ottum, member of Creditor Committee, Jeanne Haas, member of Creditor Committee, Gloria Murphy, member of Creditor Committee, Ralph Anderson, member of Creditor Committee, Doris Beuttler, member of Creditor Committee, Genevieve Hostak, member of Creditor Committee, Marlene Weichmann, member of Creditor Committee, Mary Mueller, member of Creditor Committee, Wood Family Trust, member of Creditor Committee and Mary Holtz, member of Creditor Committee,

Appellants,

v.

Michael S. Polsky, Esq., Receiver and The Bank of New York Mellon Trust Company, N.A.,

Respondents-Petitioners.

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 322, 964 N.W.2d 544
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | March 16, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Racine |
| JUDGE: | Michael J. Piontek and David W. Paulson |

4

JUSTICES:

REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court.

NOT PARTICIPATING:

ATTORNEYS:

For the respondents-petitioners, there were briefs filed by *Katherine Stadler, Carla O. Andres, Michael S. Polsky*, and *Godfrey & Kahn, S.C.,* Madison, and *Beck, Chaet, Bamberger & Polsky, S.C.,* Milwaukee. There was an oral argument by *Katherine Stadler* and *Joseph M. Peltz.*

For the plaintiffs-appellants, there was a brief filed by *John A. Becker* and *Becker & French,* Racine. There was an oral argument by *John A. Becker* and *Thomas M. Devine.*

An amicus curiae brief was filed by *James E. Bartzen* and *Boardman & Clark LLP*, Madison, for the Wisconsin Bankers Association.

**2023 WI 19**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos. 2019AP1728 & 2019AP2063
(L.C. No. 2007CV1133)

STATE OF WISCONSIN      :      IN SUPREME COURT

**In re:**

**The Atrium of Racine, Inc., d/b/a The Atrium and Bay Pointe:**

**Marilyn Casanova, member of Creditor Committee, Audrey J. Fox, member of Creditor Committee, Dr. Melvin Miritz, member of Creditor Committee, Linda Miritz, member of Creditor Committee, Edward and Louise Langleib Trust, member of Creditor Committee, Carleton Musson, member of Creditor Committee, Wilma Milovancevic, member of Creditor Committee, Helen Taylor, member of Creditor Committee, Louis P. Teicheret Trust, member of Creditor Committee, Reverend Frederick Marks, member of Creditor Committee, Jewel Marks, member of Creditor Committee, Patricia Meier, member of Creditor Committee, Patricia Teernstra, member of Creditor Committee, Andrew Mikaelian, member of Creditor Committee, Marcella Mikaelian, member of Creditor Committee, Josephine Brooks, member of Creditor Committee, Evelyn Odell, member of Creditor Committee, Laurence Freer, member of Creditor Committee, Dorothy Kohl, member of Creditor Committee, Karen Boerger, member of Creditor Committee, Jacqueline Williamson, member of Creditor Committee, Judy Glowinski, member of Creditor Committee, Anne Tredwell, member of Creditor Committee, Marilyn Baham, member of Creditor Committee, Elsie Gotzman, member of Creditor Committee, Lucille Ciaramita, member of Creditor Committee, Joanne Ramaker, member of Creditor Committee, Johanna Sander, member of Creditor Committee, Thomas Eser, member of Creditor Committee, Henryetta Eser, member of Creditor Committee, Grace Nelson, member of Creditor Committee, Jane Odders, member of Creditor Committee, David Nelson, member of Creditor Committee, Ray Katt (deceased), member of Creditor Committee, Louise Katt, member of Creditor Committee,**

**FILED**

**MAR 16, 2023**

Sheila T. Reiff
Clerk of Supreme Court

Ethel Hader, member of Creditor Committee, Warren Larsen, member of Creditor Committee, Ellen Larsen, member of Creditor Committee, Frances Scott, member of Creditor Committee, Susan Prouty, member of Creditor Committee, Robert Rainey, member of Creditor Committee, Patricia Rainey, member of Creditor Committee, Helen Eckheart, member of Creditor Committee, Wilma Wiser, member of Creditor Committee, Earl Christianson, member of Creditor Committee and Marian Bloch, member of Creditor Committee,

     Appellants,

Var Krikorian, Ruth Minton, Richard Minton, Walter Steidl, Irene Miller, Marian Kornwolf, Marjorie Speckhard, Delores Torphy, Geraldine Baumblatt, Joan Peterson, John Rowland, Julianne Rowland, Lorraine Pavelcik, Marilyn Iselin, Metta Reiker, Prudence White, Elaine Oetlinger, Esther Wulff, Helen Veenstra, Rev. Dr. Ross Henry Larson, Fred and Nancy Flofer, Winifried Wiser, Nazaly Bagdasian, Robert Callaway, Estate of Elaine Zlevor, Marshall Cushman, Bernard Braun, Patricia Braun, Bob Ottum, Holly Ottum, Joyce Ottum, Jeanne Haas, Gloria Murphy, Ralph Anderson, Doris Beuttler, Genevieve Hostak, Marlene Weichmann, Mary Mueller, Wood Family Trust and Mary Holtz,

     Claimants-Appellants,

   v.

Michael S. Polsky, Esq. , Receiver and The Bank of New York Mellon Trust Company, N.A.,

     Respondents-Petitioners.

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court.

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA GRASSL BRADLEY, J. After the Atrium, a senior-living facility, defaulted on debt service payments to a

group of bondholders, the facility filed a petition for receivership.[1] The court-appointed receiver sold the Atrium's assets, generating more than $4 million in proceeds. According to the receiver, the Atrium owed the bondholders more than $6 million, secured by a valid mortgage lien on the Atrium's estate. Many of the Atrium's residents claimed they were entitled to the proceeds of the sale because, under their residency agreements, they were owed reimbursement of the entrance fees they paid to the Atrium. The circuit court concluded the bondholders' mortgage lien was superior to the residents' entrance fee claims.[2] The court of appeals reversed, applying M&I First National Bank v. Episcopal Homes Management, Inc., 195 Wis. 2d 485, 536 N.W.2d 175 (Ct. App. 1995) to deem the residents' claims superior to the bondholders' lien.[3]

¶2 Before this court, the residents concede the bondholders possess a valid, perfected mortgage lien on the Atrium's estate, but the residents argue (1) the bondholders contracted away the superiority of their mortgage lien, and (2)

---

[1] A receivership is a sequestration of an insolvent estate's assets, and a receiver is an impartial manager of those assets. Admanco, Inc. v. 700 Stanton Drive, LLC, 2010 WI 76, ¶32, 326 Wis. 2d 586, 786 N.W.2d 759; see also, BNP Paribas v. Olsen's Mill, Inc., 2011 WI 61, ¶101, 335 Wis. 2d 427, 799 N.W.2d 792 (Roggensack, J., concurring).

[2] Judge David W. Paulson, Racine County, presided. As proceedings continued, Judge Michael J. Piontek and later Judge Jon E. Frederickson rotated onto the case.

[3] Casanova v. Polsky, Nos. 2019AP1728 & 2019AP2063, unpublished slip op. (Wis. Ct. App. July 30, 2021).

2

Episcopal Homes grants entrance fee claims superiority. We disagree and hold: (1) Under Wis. Stat. § 128.17 (2021-22), the bondholders' mortgage lien is superior to the residents' contract claims;[4] (2) the bondholders did not contract away the superiority of their lien; and (3) Episcopal Homes does not apply to the proceeds from the sale of real property with a properly perfected mortgage lien. We therefore reverse the decision of the court of appeals.

## I. BACKGROUND

### A. Bay Pointe Project and Financing Documents

¶3 The Atrium of Racine, Inc. was a nonprofit corporation that owned and operated a 76-unit senior-living facility. In 2002, the Atrium sought to build an assisted-living home called Bay Pointe. To finance the project, the Atrium contracted with the Elderly Housing Authority of the City of Racine (the Authority) to issue bonds. The Authority sold the bonds to Bank One Trust Company, National Association,[5] trustee for a group of approximately 800 investors (the Bondholders' Trustee). To effectuate this transaction, various parties entered into a series of contracts: a Project Contract between the Atrium and the Authority; a Mortgage and Security Agreement (the Mortgage) between the Atrium and the Authority (which assigned its

---

[4] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

[5] Bank One is the predecessor in interest to New York Mellon Trust Company, N.A., which now serves as the Bondholders' Trustee.

3

interest to the Bondholders' Trustee); and, between the Authority and the Bondholders' Trustee, a Trust Indenture (collectively, the Financing Documents). As required by securities regulations, the bond underwriter[6] prepared an Official Statement summarizing the material terms and conditions of the bond issuance as well as the risks of investing. Because the Official Statement is not a contract, it was not signed by any party, nor was it incorporated by reference into any contract.

¶4 The Project Contract established the process by which the bonds would issue as well as the terms and conditions governing the Atrium's construction expenditures. Under its terms, the Authority would issue and sell revenue bonds, depositing the proceeds into a Project Fund from which the Atrium would draw to cover construction expenses.[7] Under the Mortgage, the Atrium pledged its real estate, tangible personal property, revenue, and proceeds of the foregoing to the Authority as collateral for repayment of the bond proceeds.

---

[6] A bond underwriter purchases bonds from an issuer and distributes those bonds to the public. Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys., 468 U.S. 207, 217 n.17 (1984). By purchasing and selling bonds on its own account, an underwriter assumes all risk of loss from the issuer. Id. at 218 n.18.

[7] The proceeds from the sale of the bonds were a loan from the Authority to the Atrium, for which the Atrium signed promissory notes documenting its duty to repay the Authority.

4

¶5    Bank One purchased $8,050,000 in Atrium bonds from the Authority under the Trust Indenture,[8] which assigned to Bank One (as Bondholders' Trustee) the Authority's Mortgage lien on the Atrium's estate.    After purchasing the bonds, Bank One perfected its security interest in the real estate by filing the Mortgage with the Racine County Register of Deeds.    It also filed a UCC financing statement with the Wisconsin Department of Financial Institutions, which documented Bank One's security interest in the Atrium's assets and perfected its security interest in collateral other than real estate.[9]    No party disputes the bondholders possess a properly perfected mortgage lien on the Atrium's estate.

### B.  Residency Agreements

¶6    Before moving into the Atrium, each resident signed a residency agreement[10] requiring the resident to pay an entrance

---

[8] A trust indenture is a "document containing the terms and conditions governing a trustee's conduct and the trust beneficiaries' rights."  Trust indenture, Black's Law Dictionary 919 (11th ed. 2019).

[9] The parties do not dispute that when New York Melon succeeded Bank One in interest, all necessary continuation, assignment, and name-change documents were filed with the State.

[10] Over time, the Atrium altered the form, substance, and language of these agreements for new residents.  The record contains six different versions of the agreement, but the differences among them do not affect our analysis.

fee ranging from $40,000 to $238,000.[11] Collectively, Atrium residents had paid over $7.5 million in entrance fees at the time this suit started. Upon moving out of the Atrium, each resident's entrance fee would be partly refundable when a new resident moved into the Atrium and paid an entrance fee. To calculate a refund, the Atrium used one of two formulas depending on which version of the residency agreement the resident signed. The first formula provided for a flat 90% refund. The second formula used an "option ratio," under which the refund varied based on the value of the new resident's entrance fee. Once a new fee was paid, the Atrium used that money to refund the entrance fee paid by the former resident. Entrance fees were deposited in the Atrium's general operating account——commingled with the funds for day-to-day expenses—— rather than a segregated account.

## C. Receivership

¶7 This suit arose when the Atrium defaulted on its debt service payments to the bondholders. Under Wis. Stat. ch. 128, the Atrium commenced a voluntary assignment for the benefit of

---

[11] Certain agreements required Atrium residents to pay a security deposit in addition to an entrance fee. In the conclusion section of their brief, the residents request we hold "the residents are entitled to reimbursement of their entrance fees and security deposits out of the proceeds of the sale of the Atrium before payment to the Bondholders." The residents do not, however, develop any argument regarding security deposits specifically; rather, the residents ask us to treat their entrance fees as security deposits under Episcopal Homes. As explained in this opinion, the bondholders' properly perfected mortgage lien has priority over the residents' claims with respect to the proceeds from the sale of real property.

creditors in the circuit court. The court appointed a receiver, vesting him with "all of the usual powers . . . pursuant to Chapter 128 of the Wisconsin Statutes[.]" The court specifically authorized the receiver "to sell any and all property of the [Atrium] free and clear of all liens, with all liens attaching to the proceeds of sale in the order of their priority, through public or private proceedings, in any commercially reasonable manner, subject to the prior approval of [the] Court."

¶8 The receiver notified the Atrium's creditors and other interested parties of his appointment and requested they file their verified claims with the circuit court. Residents individually filed proofs of claim for refund of entrance fees collectively totaling more than $7 million. One resident, Dr. Ross Henry Larson, moved for the creation of a resident committee under Wis. Stat. § 128.10. The circuit court granted Dr. Larson's motion but emphasized the narrow scope and limited duties of the committee:

> The Court's already indicated that I have reservations about any committee that has power to [a]ffect a power of the receiver. . . . If it's necessary that I authorize a resident creditors committee, I will do so. But I'm being very, very specific here that the duties of that committee will not interrupt or overlap with the receiver's duty, but those resident committees can be obviously to advise. It'll be a way for [the receiver] to interact with all of the creditors without having to go through 70 different notices and approvals.

¶9 The bondholders filed their own proof of claim for $6,264,620.65. The receiver noted the bonds were "secured by

7

first position properly perfected security interests and mortgages" and determined the Atrium owed the bondholders' trust more than $6,097,000. As for cash in the Atrium's estate, the receiver found only two accounts, neither holding funds sufficient to continue operating the Atrium——or to pay the debt owed to the bondholders. The first account was a "general operating account" containing $80,795.11; the second was a "Resident Trust Account" containing less than $3,000. According to counsel for the receiver, the Resident Trust Account "did not have entrance fees deposited" into it. Instead, it held "some minimal amount of funds that [were] paid by the residents for various services at the debtor's facilities[.]"

¶10 Given the extent of the claims against the Atrium's estate and its meager amount of cash, the receiver moved for authorization to enter into a listing agreement and sell the Atrium's assets. The receiver concluded a sale would maximize the estate's value for the benefit of the creditors. After the circuit court granted the receiver's motion, the receiver entered into a listing agreement with Senior Living Investment Brokerage, Inc.

¶11 Along with the motion for authorization to sell the assets, the receiver moved for permission to use the Atrium's revenue to continue operating the facility. The residents objected to this motion. Allowing the receiver to spend the Atrium's revenue, they argued, would "dissipate[]" the Atrium's assets and leave "nothing . . . available for the return of millions of dollars in entrance fee funds." In response to this

objection, the receiver again noted the bondholders' secured interest in the Atrium's assets. Without authorization to use the Atrium's assets, he determined the Atrium would be forced to close. The circuit court granted the receiver's motion.

¶12 Months later, the receiver moved for declaratory relief, requesting the circuit court declare the bondholders' Mortgage lien superior to the residents' entrance fee claims. The residents again objected, and filed a motion for summary judgment "in the amount of $7,983,739" asking the court to impose a constructive trust in that amount. The residents also filed a motion for declaration of interest, maintaining the Financing Documents, along with the Official Statement, established the superiority of their entrance fee claims. After briefing, the court held a joint hearing on the parties' motions.

¶13 In an April 2018 order, the circuit court granted the receiver's motion for declaratory relief and denied the residents' motion for summary judgment. In its written decision, the court found (1) the residents were not entitled to a constructive trust on any proceeds from the sale of the Atrium's assets and (2) none of the Financing Documents or the Official Statement subordinated the bondholders' Mortgage lien to the residents' entrance fee claims. Despite having both of their motions denied, the residents did not appeal this order.

### D. Sale of the Atrium

¶14 More than a year later, with the priority dispute resolved, the receiver found a suitable buyer for the Atrium, a

senior-housing and healthcare company called PC39. The parties negotiated an Asset Purchase Agreement (APA), and set the sale price of the Atrium at $5,500,000. The sale included all of the Atrium's real and personal property but excluded any liability relating to the residents' entrance fees. Under the APA, the proceeds from the sale were to be paid to the bondholders.

¶15 The receiver moved for authorization to proceed with the sale pursuant to the APA, but the residents objected, citing the APA's payment of proceeds to the bondholders. The parties filed a stipulation requesting an order for the proceeds to be held in escrow pending resolution of the residents' objection. In the stipulation, the residents noted their intention to appeal the April 2018 order on payment priority. The receiver and the trustee jointly responded to the residents' objection, arguing the deadline for appealing the April 2018 decision had long passed; therefore, the residents had waived their right to appeal the order.

¶16 In resolving the residents' objection, the circuit court issued two orders. The first, entered on July 31, 2019, authorized the receiver to sell the Atrium's assets, while the second required the receiver to hold the sale proceeds in escrow

10

pending appeal. About a week later, the sale closed, and the receiver placed the net proceeds of $4,711,518.78[12] in escrow.

### E. Appeals

¶17 Soon after the sale closed, the residents filed a proposed order with the circuit court on September 6, 2019[13] reiterating the substance of the April 2018 order but adding: "This order is final for the purposes of appeal." Later that day, the receiver sent the court a letter in response, again emphasizing the residents' window for appeal had passed. He also asserted "[t]here [was] no basis to modify or vacate the 2018 Order[.]" The court did not respond to either letter.

¶18 Around this time, the residents appealed the July 31, 2019 sale order.[14] Thereafter, the circuit court entered the residents' proposed order on October 17, 2019, reaffirming the substance of the April 2018 priority order and stating the new order was final for purposes of appeal.[15] The residents appealed this order, not the April 2018 order.[16]

---

[12] According to a status report filed by the receiver, the total amount placed in escrow reflects the Atrium's list price minus "Court-approved professional fees, the commission owed to Senior Living Investment Brokerage, Inc., a deferred maintenance credit to the Buyer in the amount of $250,000, taxes, and other customary prorations pursuant to the Asset Purchase Agreement, as amended, the Sale Order and the Stipulation."

[13] Only the cover letter, but not this proposed order, appears in the appellate record.

[14] This appeal was docketed as appeal No. 2019AP1728.

[15] Like the proposed order, the order entered by the circuit court is not in the appellate record.

[16] This appeal was docketed as Appeal No. 2019AP2063.

¶19 On appeal, the two cases were consolidated, and the court of appeals reversed the circuit court's priority judgment. Relying on Episcopal Homes, the court of appeals concluded "the rights of the Residents to their entrance fees and security deposits are superior to the Bondholders' rights to the Atrium's assets[.]"[17] In addition to their priority argument, the residents also contended "[t]he receiver violated his fiduciary duty to the residents when he took the side of one creditor over another." The court of appeals rejected this argument.[18]

¶20 On August 27, 2021, the bondholders and the receiver filed a petition for review, presenting the following two issues: (1) "May an undocumented, unrecorded lien——created by judicial fiat——have priority over the Trustee's properly perfected first mortgage and security interest?" and (2) "Did the Court of Appeals (and, by extension, this Court) lack jurisdiction over these appeals by virtue of the failure to appeal from a final order dated April 23, 2018?" We granted review on both issues. Without filing a petition for review or cross-review, the residents in their briefing again claimed the receiver violated his fiduciary duties. The receiver filed a motion to deem the issue forfeited, to which the residents filed a response. We "decline[d] to foreclose our right to consider [the question]" and ordered supplemental letter briefing, which the parties submitted.

---

[17] Casanova, Nos. 2019AP1728 & 2019AP2063, ¶18.

[18] Id., n.12.

## II. STANDARD OF REVIEW

¶21 "Whether to grant 'a declaratory judgment is addressed to the circuit court's discretion.' When the exercise of discretion turns on a question of law, however, our review is" independent. Talley v. Mustafa Mustafa, 2018 WI 47, ¶13, 381 Wis. 2d 393, 911 N.W.2d 55 (quoting Olson v. Farrar, 2012 WI 3, ¶24, 338 Wis. 2d 215, 809 N.W.2d 1).

¶22 This case requires us to determine the priority of a properly perfected mortgage lien interest, which is a question of statutory interpretation. See BNP Paribas v. Olsen's Mill, Inc., 2011 WI 61, ¶37, 335 Wis. 2d 427, 799 N.W.2d 792. "Statutory interpretation presents a question of law" this court reviews independently. Teigen v. Wis. Elections Comm'n, 2022 WI 64, ¶12, 403 Wis. 2d 607, 976 N.W.2d 519 (citing T.L.E.-C. v. S.E., 2021 WI 56, ¶13, 397 Wis. 2d 462, 960 N.W.2d 391). Additionally, this case requires us to interpret contracts, also a question of law this court reviews independently. Tufail v. Midwest Hosp., LLC, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586 (citing Ehlinger v. Hauser, 2010 WI 54, ¶47, 325 Wis. 2d 287, 785 N.W.2d 328).

## III. DISCUSSION

### A. Finality of the April 2018 Order

¶23 As a threshold matter, the bondholders and the receiver ask us to conclude the residents forfeited their right to appeal the circuit court's decision on priority. They argue the April 2018 order was final for purposes of appeal. Because the residents did not appeal that order until July 2019, they

argue the residents lost the right to appeal it. For the purpose of deciding the important substantive issue of law presented by the dispute over priority, we assume without deciding the April 2018 order was not final and the residents properly appealed the circuit court's July 31, 2019 order establishing the superiority of the bondholders' Mortgage lien over the residents' entrance fee claims.

## B. Financing Documents

¶24 Relying on provisions of the Financing Documents and the Official Statement, the residents assert the bondholders contracted away the superiority of their Mortgage lien. Certain provisions, they argue, subordinated the bondholders' Mortgage lien to the contractually required repayment of the residents' entrance fees. We disagree.

¶25 The receivership statutes control the resolution of this issue. When an entity is placed under receivership, the receiver may, with court permission, "sell assets and distribute the proceeds of the sale." BNP Paribas, 335 Wis. 2d 427, ¶42. Upon closing, the receiver must distribute the proceeds among the estate's creditors pursuant to Wis. Stat. § 128.17, which establishes the order of payment:

> (1) The order of distribution out of the debtor's estate shall be as follows:
>
> (a) The actual and necessary costs of preserving the estate subsequent to the commencement of the proceedings.
>
> (b) Costs of administration including a reasonable attorney's fee for the

14

representation of the debtor.

(d) Wages, including pension, welfare and vacation benefits, due to workmen, clerks, traveling or city salespersons or servants, which have been earned within 3 months before the date of the commencement of the proceedings, not to exceed $600 to each claimant.

(e) Taxes, assessments and debts due the United States, this state or any county, district or municipality.

(f) Other debts entitled to priority.

(g) Debts due to creditors generally, in proportion to the amount of their claims, as allowed.

(h) After payment of the foregoing, the surplus, if any, shall be returned to the debtor.

Section (f) describes certain secured claims and encompasses mortgages under Wis. Stat. § 706.11, which grants priority to mortgages "executed to a state or national bank." This provision includes the Mortgage because the Bondholders' Trustee is a national bank association. Section 706.11(1) provides that when "[a]ny mortgage executed to a state or national bank" "has been duly recorded, it shall have priority over all liens upon the mortgaged premises and the buildings and improvements thereon . . . filed after the recording of such mortgage" with exceptions only for certain categories of liens under which the residents' entrance fee claims undisputedly do not fall.

¶26 Secured creditors like the Bondholders' Trustee have "the right, on the debtor's default, to proceed against collateral and apply it to the payment of the debt." Secured

15

creditor, Black's Law Dictionary 465 (11th ed. 2019). A secured creditor "cannot have his security taken away from him without his consent." BNP Paribas, 335 Wis. 2d 427, ¶44 (quoting Wis. Brick & Block Corp. v. Vogel, 54 Wis. 2d 321, 326, 195 N.W.2d 664 (1972)).

¶27 Section (g) describes unsecured claims. BNP Paribas, 335 Wis. 2d 427, ¶115 (Roggensack, J., concurring) ("Paragraph (1)(g) addresses the distribution to unsecured creditors."). Unlike secured creditors, unsecured creditors have "no property interest in the debtor's assets[.]" BNP Paribas, 335 Wis. 2d 427, ¶43. Accordingly, when distributing proceeds from the sale of an estate, a receiver must satisfy debts held by secured creditors before satisfying those held by unsecured creditors. See id., ("[U]nsecured creditors are entitled to distribution of any proceeds of a sale only after priority claims have been satisfied." (citations omitted)).

¶28 The parties agree the bondholders are secured creditors and the residents are unsecured creditors. Both seek first payment from the proceeds of the sale of the Atrium's assets, which are insufficient to pay either claim, much less both. Typically, those facts alone would settle this dispute: Because Wis. Stat. § 128.17 prioritizes the claims of secured creditors over those of unsecured creditors, the bondholders would receive first payment. In this case, however, the residents argue the bondholders subordinated their secured interest to the residents' interest in their entrance fees.

16

¶29 To subordinate a secured interest, a secured creditor usually signs a subordination agreement, a contract modifying "the priorities that would otherwise exist." Scotiabank de Puerto Rico v. Brito (Plaza Resort at Palmas, Inc), 469 B.R. 398, 408 (B.A.P. 1st Cir. 2012); see also, Restatement (Third) of Property § 7.7 cmt. a (1997) (explaining a subordination agreement is a document "reducing [a] mortgage's priority below that of some other interest or group of interests in the real estate to which the mortgage would otherwise be superior"). The residents do not contend the bondholders signed a subordination agreement. Instead, they argue the bondholders consented in the Financing Documents and the Official Statement to the subordination of their Mortgage. Although "[i]t is true that a subordination can be incorporated" into any contract, see Restatement (Third) of Property § 7.7 cmt. a, the Official Statement is not a contract and the Financing Documents do not contain any provision subordinating the bondholders' Mortgage.

¶30 The residents first point to the definitions of "permitted liens" and "permitted encumbrances" in the Official Statement, Project Contract, and the Mortgage. The parties construe these phrases to include entrance fees. We agree with this construction. The Mortgage states "permitted encumbrances" include "[l]iens permitted under Section 5.12(b) of the [Project Contract]." According to the Project Contract, "Permitted Liens shall consist of . . . [e]ntrance fees or similar funds deposited by or on behalf of such residents[.]" The residents therefore argue if the Financing Documents grant either

17

permitted liens or permitted encumbrances priority over the bondholders' Mortgage lien, entrance fees must be refunded before the Mortgage is paid.

¶31 The residents direct our attention to the phrase "subject to" as it appears in both the Official Statement and the Mortgage. The Official Statement provides, in relevant part:

> Pursuant to the Mortgage, the Corporation has granted to the Trustee a first mortgage lien on the campus currently owned by the corporation . . . <u>subject in each case to Permitted Liens</u> as defined in the Project Contract.

(Emphasis added.) The Mortgage contains similar language:

> This Mortgage constitutes a direct and valid lien on and security interest in the Mortgaged Property <u>subject only to Permitted Encumbrances</u>.

(Emphasis added.) Neither provision subordinates the bondholders' Mortgage.

¶32 Because the Official Statement is not a contract, it is incapable of containing a subordination agreement. It is not an agreement at all, in whole or in part. The residents contend the Official Statement must be "controlling" because there is no other explanation for why it exists. To the contrary, it exists

18

because the government says it must.[19]  The residents accurately argue the Official Statement serves as a notice to investors of investment risks and "what claims might be superior to theirs," but nothing in the Official Statement actually subordinates the bondholders' Mortgage.

¶33  Undefined in the only contract in which the pertinent language appears, the phrase "subject to" must take its ordinary meaning.  See Town Bank v. City Real Est. Dev., LLC, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476 ("We construe [] contract language according to its plain or ordinary meaning") (citing Huml v. Vlazny, 2006 WI 87, ¶52, 293 Wis. 2d 169, 716 N.W.2d 807).  As used in the Mortgage, it means "to be affected by or possibly affected by (something)."  Subject to, Merriam-Webster's Collegiate Dictionary, https://unabridged.merriam-webster.com/collegiate/subject%20to (last visited Jan. 9, 2023).

---

[19] See, e.g., 15 U.S.C. § 77j(a)(1) ("[A] prospectus relating to a security other than security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration statement"); Wis. Stat. § 551.303(2)(a) (requiring "[a] copy of the latest form of prospectus filed under the Securities Act of 1933"); 17 C.F.R. § 240.15c2-12 ("Prior to the time the Participating Underwriter bids for, purchases, offers, or sells municipal securities in an Offering, the Participating Underwriter shall obtain and review an official statement that an issuer of such securities deems final as of its date, except for the omission of no more than the following information:  The offering price(s), interest rate(s), selling compensation, aggregate principal amount, principal amount per maturity, delivery dates, any other terms or provisions required by an issuer of such securities to be specified in a competitive bid, ratings, other terms of the securities depending on such matters, and the identity of the underwriter(s).").

In construing a statute, the court of appeals embraced this definition "as suitable for the facially broad phrase 'subject to.'" State v. Quisling, 2018 WI App 35, ¶25, 382 Wis. 2d 272, 915 N.W.2d 730. To be affected by or possibly affected by something is not necessarily to be trumped, dominated, or primed by it. These provisions merely contemplate the possibility entrance fees could take priority over the bondholders' Mortgage; they do not create a lien, much less accord it priority over a properly recorded mortgage.

¶34 The residents' entrance fees are nothing more than unsecured, contingent liabilities of the Atrium. As the residents themselves concede, their entrance fees are not liens and the residents never attempted to create liens. Although the Mortgage is subject to Permitted Encumbrances, which include liens permitted under Section 5.12(b) of the Project Contract, the entrance fees never became liens on the real property of the Atrium. Having never become liens, the residents' unsecured claims for recovery of their entrance fees could not possibly trump the bondholders' Mortgage.

¶35 Other provisions on which the residents rely likewise merely acknowledge superior claims might exist. Section 5.12(a) of the Official Statement provides:

> [R]esidents of the facilities that require entrance fees may have certain rights with respect to their entrance fees and therefore the entrance fees held by the Corporation may not be available to pay the Series 2002 Bonds in the event of a foreclosure.

(Emphasis added.) The Project Contract similarly states:

20

The Obligor agrees that it will not create or suffer to be created or exist any Lien upon its Property . . . <u>other than Permitted Liens whenever created, all of which Permitted Liens may be superior to the Lien of the Mortgage</u>[.]

(Emphasis added.). The key word in these provisions is "may." Like "subject to," this word does not subordinate the Mortgage. It most naturally conveys only "a possibility." May, <u>Black's Law Dictionary</u> 1000 (8th ed. 2004); <u>see also</u>, May, <u>Webster's Second New International Dictionary</u> 1517 (citation omitted). In effect, these provisions merely convey there is a possibility Permitted Liens could be superior to the Mortgage lien. Possibilities are not realities; the residents never attempted to create liens on the Atrium's real property, and these provisions do not subordinate the bondholders' secured lien to the residents' unsecured claims for entrance fees.

¶36 The residents cite one more provision, Section 3.8 of the Mortgage, which reads:

Section 3.8. Permitted Encumbrances. Except for the Permitted Encumbrances, Obligor will not enter, create or suffer to be created any further Lien upon the Mortgaged Property, or any part thereof, <u>whether or not prior to or subordinate to or on a parity with the Lien of this Mortgage</u>, without the prior written consent of the Trustee[.]

(Emphasis added.) Notwithstanding the fact the residents have disclaimed having any liens on the Atrium's real property, nothing in this provision subordinates the Mortgage to any Permitted Encumbrance or "any further Lien." Regardless of whether the residents possess liens or not, this provision says nothing about the priority accorded to them. Notably, Section

21

3.8 contemplates the Permitted Encumbrances or other Lien may be merely "subordinate to or on a parity with" the Mortgage lien; nevertheless, the Atrium agreed it would not "enter, create or suffer to be created any further Lien"——even one subordinate to the Mortgage——without the prior written consent of the Bondholders' Trustee. The residents present no evidence the Bondholders' Trustee consented to subordination of the bondholders' Mortgage.

¶37 Nothing in the Financing Documents or the Official Statement subordinates the bondholders' Mortgage. The provisions cited by the residents merely contemplate the possibility that the Mortgage could be subordinated to other liens. Nothing in the Financing Documents or the Official Statement creates any liens or other encumbrances, much less subordinates the mortgage to them. We therefore apply Wis. Stat. § 128.17, which accords the bondholders' Mortgage priority.

### C. Episcopal Homes

¶38 The residents next rely on Episcopal Homes——a court of appeals decision not binding on this court. Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶63, 403 Wis. 2d 1, 976 N.W.2d 263 (Rebecca Grassl Bradley, J., concurring) (explaining this court is not bound by the decisions of the court of appeals); see also State v. Yakich, 2022 WI 8, ¶31, 400 Wis. 2d 549, 970 N.W.2d 12. We need not consider whether that case was correctly decided because, contrary to the residents'

22

analysis, Episcopal Homes differs materially from the present case as a matter of both fact and law.

¶39 Episcopal Homes involved a senior-living facility that defaulted on bond repayments. Episcopal Homes, 195 Wis. 2d at 492. In that case, a group of roughly 1,700 bondholders bought more than $11 million in bonds to fund the construction of a facility called DeKoven. Id. at 490. Under a series of financing documents, the bondholders held a security interest in an account containing approximately $1,000,000 in entrance fees. Id. at 492-93. DeKoven's residency agreements subordinated entrance fee repayments to the bondholders' lien. Id. at 492. After DeKoven defaulted on its bond repayments, the bondholders claimed a secured interest in the segregated entrance fee account funds. Id.

¶40 The circuit court granted summary judgment in favor of the DeKoven residents and imposed a constructive trust against the entrance fee account. Id. at 496. The court of appeals affirmed, concluding DeKoven had contracted with each resident as landlord and tenant; accordingly, the court deemed the rental agreements leases. Id. at 489, 506. Based on the language of the rental agreements, the court concluded the entrance fees were effectively security deposits under Wis. Admin. Code § ATCP 134.02(11), governed by the public policy espoused in the administrative code. Id. at 507, 509. Because Wisconsin Admin. Code § 134.06(3) prohibits using standard forms to place additional conditions on the return of security deposits, the

23

court determined any subordinating provisions in the rental agreements were unenforceable. Id. at 511-12.

¶41 The court of appeals also upheld the circuit court's imposition of a constructive trust against the segregated entrance fee account. Id. at 514. It held the subordination provisions unconscionable because they violated public policy. Id. at 513. Additionally, the court concluded the bondholders would have been unjustly enriched if those provisions were enforced. Id. Because the court decided the elements of a constructive trust were satisfied, it affirmed the circuit court. Id. at 514.

¶42 The residents in this case claim their entrance fees, like those paid by the DeKoven residents, constitute security deposits. In their view, the sale proceeds represent "what is left of their entrance fees" entitling them to the proceeds under Episcopal Homes. Misconstruing Episcopal Homes, the court of appeals adopted the residents' arguments and ignored Wisconsin law governing the priority of properly perfected mortgage liens over unsecured claims with respect to proceeds from the sale of mortgaged real estate.

¶43 Episcopal Homes is inapplicable to the facts of this case. In Episcopal Homes, the court of appeals exercised equitable powers against a segregated account containing funds traceable to the residents' payment of entrance fees. In contrast, the residents of the Atrium seek to usurp a first priority lien on the proceeds from the sale of real property. Whatever equitable powers courts may possess, nothing in law or

24

equity authorizes courts to disrupt the statutorily prescribed priority of secured lenders. See Law v. Siegel, 571 U.S. 415, 421 (2014) (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.")). In this case, Wis. Stat. §§ 706.11 and 128.17 grant the bondholders' Mortgage lien unequivocal superiority. The residents' argument for extending Episcopal Homes beyond a segregated account of entrance fees not in receivership to reach the materially distinct proceeds from the sale of real property subject to a perfected mortgage lien asks this court to disregard the plain language of chapter 128. We have no legal authority to do so.

## D. Fiduciary Duties

¶44 As a final matter, the residents challenge the court of appeals' decision holding the receiver did not violate his fiduciary duties to the residents when he moved the circuit court to issue an order on priority. Casanova v. Polsky, Nos. 2019AP1728 & 2019AP2063, unpublished slip op., ¶18 n.12 (Wis. Ct. App. July 30, 2021). This argument is underdeveloped. The residents do not engage in any detailed analysis to support this argument and do not request any relief to remedy the receiver's alleged breach of fiduciary duty. Because we need not address underdeveloped arguments, we decline to address this claim. Papa v. Wis. Dep't of Health Servs., 2020 WI 66, ¶42 n.15, 393 Wis. 2d 1, 946 N.W.2d 17; see also, Teigen v. Wisconsin

25

Elections Comm'n, 2022 WI 64, ¶45, 403 Wis. 2d 607, 976 N.W.2d 519 (lead op.).

### IV. CONCLUSION

¶45 Under Wis. Stat. § 128.17, the bondholders' Mortgage lien has priority over the residents' entrance fee claims. No provision of the Financing Documents subordinates the bondholders' lien, and Episcopal Homes does not extend to the proceeds from the sale of real property with a properly perfected mortgage lien. The bondholders are therefore entitled to first payment from the proceeds of the sale of the Atrium's assets.

*By the Court.*—The decision of the court of appeals is reversed.

1